Paul Anthony WHITE, Appellant,

v.

UNITED STATES of America, Appellee.

No. 87–2488.

United States Court of Appeals,
Eighth Circuit.

Submitted June 9, 1988.

Oct. 3, 1988.

Paul Anthony White, Kansas City, Mo., for appellant.

Anita L. Mortimer, Asst. U.S. Atty., Kansas City, Mo., for appellee.

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), allows a defendant

Before McMILLIAN, JOHN R. GIBSON and MAGILL, Circuit Judges.

McMILLIAN, Circuit Judge.

Paul Anthony White appeals from a final judgment entered in the District Court[1] for the Western District of Missouri denying his motion for relief under 28 U.S.C. § 2255. After denying the element of interstate transportation, White entered an *Alford* plea[2] in 1982 to one count of transporting a minor across state lines for purposes of prostitution in violation of 18 U.S.C. § 2423. For reversal White argues the district court erred in refusing to set aside his plea on the grounds that the sole witness has recanted the testimony which provided the only factual basis for the interstate element, and that the government failed to disclose evidence favorable to White on the issue of guilt, thereby rendering his plea unintelligent. For the reasons discussed below, we affirm the judgment of the district court.

I. BACKGROUND

White was an Assistant United States Attorney for the Western District of Missouri for approximately ten years, until December 1977. Around 1981 the FBI apparently focused on White in the course of an investigation, code-named "Northstone," into the interstate transportation of obscene matter. When possible state law violations were revealed, a joint investigation of White was undertaken in 1982 by Robert Reilley of the FBI and Gary Myers of the Kansas City (Missouri) Police Department. The two men agreed that Reilley would ask most of the questions during interviews, take the notes, and write all of the reports for both federal and state investigations.

On or about February 19, 1982, Reilley and Myers first interviewed Jerry Noble, then eighteen years old, regarding his knowledge of White's sexual activities with young males. Noble denied any sexual

to waive the right to trial by pleading guilty while protesting innocence of the charged offense, at least where the prosecution demonstrates a factual basis for the plea.

involvement with White. Reilley's FBI Form FD–302 report of the interview, which White later obtained through pretrial discovery, reflected that general denial, but did not mention Noble's negative response to Reilley's specific question whether White had ever transported him across state lines for purposes of prostitution. Reilley admitted the omission in a deposition in December 1985.

In a February 23 memorandum in the "Northstone" file (a document White claims was not given to him as part of the prosecution's file during discovery and was not known to him until 1985), Reilley stated he contacted Noble, "a potential witness in this investigation," at the city jail on February 20, 1982, where Noble was being held after his arrest for burglary. According to the memorandum, Reilley told Noble that "his cooperation with the FBI and the police department in an unrelated investigation would be called to the attention of the Jackson County [Missouri] Prosecutor's Office" regarding the burglary charge. Upon Noble's release, Reilley took him home and "asked [him] to continue with his cooperation concerning this investigation."

On March 1, 1982, Reilley and Myers again interviewed Noble, who indicated that he wanted to disclose the full extent of his contacts with White. Noble related numerous instances of White's paying him for sexual activities in various locations identifiable as being in Missouri. Again, Reilley's 302 report, given to White in discovery, did not mention Noble's specific denial of interstate transportation for purposes of prostitution. Reilley told of the denial in his 1985 deposition.

When Noble was scheduled to appear as a witness before the Jackson County grand jury on the state case against White, he indicated to Reilley and Myers that he was not going to cooperate. After his burglary arrest, however, Noble either sought or was offered a "deal" on that charge in exchange for his grand jury testimony. Sometime between March 1 and 4, 1982, Noble met with Reilley, Myers, and Patricia McGarry, an assistant prosecuting attorney for Jackson County. During this meeting in Reilley's car, McGarry essentially agreed that no burglary charge would be brought if Noble cooperated and testified before the state grand jury. Reilley admitted in his 1985 deposition that he did not prepare a report of this meeting, and that Noble made no claim of interstate transportation. At the time of his plea, White knew about this meeting and at least some aspects of the "deal" through a statement he obtained from Noble in May 1982, as discussed below.

On March 5, 1982, Noble testified before the Jackson County grand jury. Afterward, along with two other witnesses, Noble approached Reilley in the courthouse and, for the first time, claimed to Reilley that he had been transported interstate by White for purposes of prostitution. At Reilley's request, the three young men then accompanied Reilley in his car to Kansas where they pointed out specific locations of paid sexual acts with White. Although Reilley did not prepare a written report of these events, White knew generally about them through the statement he obtained from Noble.

On April 26, 1982, a federal grand jury returned a three-count indictment against White for transporting Noble and the other two minors from Missouri to Kansas for purposes of prostitution. At some later point, the other two youths retracted their statements of interstate transportation.

On May 13, 1982, Noble signed a sworn statement for White giving his version of his contacts with Reilley and Myers, including the meeting with McGarry (who, he claimed, had promised him seven years on the burglary if he did not testify against White). He stated he had testified mistakenly before the grand jury that he had "tricked" with White when in fact he had never done so. He also stated that after testifying, "to make the case look better" and to ensure he "would not get the seven years," he had shown Reilley a Kansas location where White had supposedly taken him for the purpose of "tricking." Noble further stated that after the trip to Kansas, he and the other two youths had all admitted to each other that their state-

ments to the grand jury and to Reilley were not true.

On July 2, 1982, Chief Magistrate Calvin K. Hamilton held a hearing on the government's motion to revoke White's bond (based, apparently, on a claim that White had obstructed justice by taking statements from witnesses). At the hearing, the government informed the court that it had promised Noble nothing in return for his testimony.

Noble testified on direct examination that he had participated in sexual acts with White for money on many occasions, one of which occurred in Kansas; that White had asked him to sign the sworn statement in exchange for which White would pay Noble's attorney fees in the event he had legal problems; that the statements regarding never "tricking" with White or crossing the state line were false; and that White had provided a cashier's check for $3,500 for Noble's lawyer.

Noble testified on cross-examination that he had been promised a maximum sentence on the burglary charge if he did not testify before the grand jury about White, but that he had already given "all the statements" (apparently meaning, to Reilley) before meeting with McGarry. This contradicts Reilley's later deposition testimony that Noble first claimed interstate transportation on March 5, *after* the meeting with McGarry.

White originally pleaded not guilty. On July 19, 1982, Judge Bartlett conducted a hearing to consider a proposed plea agreement and change of plea. Under the agreement, White would admit to certain facts in connection with pending state charges, and ten one-count indictments in Clay County and one nine-count indictment in Jackson County would be dismissed; two counts of the federal indictment would be dismissed; and the government would agree not to file obstruction of justice charges against White. In accordance with the agreement, White tendered to the court an *Alford* plea of guilty to the count of the indictment relating to Noble. White admitted every element of the offense except interstate transportation; he steadfastly

maintained that all contact with Noble occurred in Missouri.

The court inquired at length into the voluntariness of the plea and its factual basis. Among other things, the court asked the government what evidence would be offered at trial to prove interstate transportation. The government responded that Noble would testify that White drove him from Kansas City, Missouri, into Kansas, engaged him in a sexual act, and drove him back to Kansas City, Missouri, where he paid him. The government also noted Noble's prior sworn testimony at the July 2 hearing that on one occasion White had transported him to Kansas where a sexual act occurred. The court further inquired about other considerations for the plea, the adequacy of White's legal counsel, the proposed plea agreement, and any predictions as to sentencing, before accepting White's plea and entering a judgment of guilty thereon.

After obtaining a presentence investigation report (PSI), the court held a sentencing hearing on August 3, 1982. As a preliminary matter, the parties stated their understanding that White did not intend ever to challenge the court's jurisdiction to accept his *Alford* plea. White and his counsel then detailed those aspects of the PSI which they disputed and asked the court not to consider for sentencing. Based on their statements, the court directed an amendment to the PSI and requested the preparation of addenda giving White's version of certain events. After additional opportunities to comment, White stated that the rest of the report was fair.

The court initially imposed the maximum sentence of ten years imprisonment and ordered a study pursuant to 18 U.S.C. § 4205. After receiving the study and hearing White's comments, the court reduced White's sentence to seven years.

This court subsequently affirmed White's conviction. *United States v. White,* 724 F.2d 714 (8th Cir.1984) (per curiam). White argued on appeal that Noble was so unreliable that his uncorroborated statements did not provide a sufficient factual basis for the jurisdictional element of

interstate transportation. This court stated that if White "believed that the testimony of the prosecution's sole witness was easily impeachable, he could have put the government to its proof in a trial," and that "the evidence presented at the guilty plea hearing on the interstate transportation element was sufficient to support the district court's acceptance of the plea." *Id.* at 716.

White also argued on direct appeal that the government should have brought "to the attention of the *trial court* at the guilty plea hearing statements allegedly made by Noble indicating that [White] did not take him into Kansas." *Id.* (emphasis added).[3] In rejecting this claim of prosecutorial misconduct, this court observed that "the government did not withhold any exculpatory information from *appellant*" or have any "reason to believe Noble's [July 2] testimony was false or that he would change his testimony if the case went to trial," and that *White* had "failed to point out to the [trial] court any inconsistencies in [Noble's] testimony." *Id.* at 717 (emphasis added).

In December 1984 White filed this section 2255 motion. Between October 1985 and October 1986 he took depositions of several individuals, including Noble, Myers, Reilley, McGarry, and Robert Larsen, government counsel who had prosecuted the case.

Noble testified in his deposition that Reilley initiated discussion of the deal with McGarry and set up the car meeting between Noble and her; that the deal required him to cooperate with Reilley; and that he did not recall his July 2 hearing testimony, which he gave after ingesting a large quantity of Valium, but if he testified then that White had taken him across the state line, that testimony was false and was induced by the statements of Reilley and McGarry that he would get seven years on the burglary if he did not "go along with them."

According to Larsen's deposition testimony, he had not discussed with Reilley any

representations Reilley may have made to witnesses to secure their testimony because, as an FBI agent, he would have no authority to make any promises to anyone; Larsen had no contacts with Jackson County prosecuting officials regarding Noble's burglary charge; Reilley did not inform Larsen of every contact he had with potential witnesses or the state prosecutors; and Reilley did not tell him that Noble had expressly denied interstate transportation until March 5, 1982.

On October 23, 1987, the district court granted the government's cross-motion for summary judgment and denied White any relief. We will address only the possibly meritorious points White argues on appeal.

## II. Validity of Plea

### A. *Brady* Claim

The essence of White's argument is that undisclosed evidence favorable to the defense rendered his *Alford* plea unintelligent and, together with Noble's recantation of the interstate claim, has eroded the factual basis upon which the court relied to accept the plea.

White's claim is based in large part on a line of cases including *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which discussed the prosecutorial duty to disclose in the context of evidence withheld until *after trial;* none of them involved a guilty plea.

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1196–97. In related cases, the Supreme Court has held that the prosecution may not elicit or fail to correct false testimony, including false evidence that there was no consideration for a witness's testimony, particularly when the "reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d

---

**3.** This claim apparently referred to allegations included in Noble's May 13 sworn statement (which, Noble testified at the July 2 hearing,

White had induced with promises of financial assistance).

1217 (1959). *See also Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972).

Because "[t]he prosecutor's office is an entity" speaking for the government, *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766, and because Reilley led the investigation for the prosecution, White asserts that Reilley's knowledge and actions are attributable to the government.[4] White argues that the government's nondisclosure of material, favorable information constitutes a *Brady* violation entitling him to have his conviction set aside. For present purposes, we will assume that the undisclosed evidence was *Brady* information.

### B. Cognizability of *Brady* Claim After Guilty Plea

"It is well settled that a *voluntary and intelligent* plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984) (footnote omitted) (emphasis added). Federal habeas inquiry focuses on the competence of counsel's advice and the voluntariness of the plea. *Tollett v. Henderson*, 411 U.S. 258, 266, 93 S.Ct. 1602, 1607, 36 L.Ed.2d 235 (1973). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.* at 267, 93 S.Ct. at 1608.

We know of no case where a habeas petitioner has challenged the voluntary and intelligent character of his *Alford*-type guilty plea with a *Brady* claim pertaining to the very element the petitioner denied when he tendered his plea. One case analyzing whether a *Brady* violation can be the basis for a collateral attack upon an outright plea of guilty is *Campbell v. Marshall*, 769 F.2d 314 (6th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 576 (1986).[5]

*Campbell*, with the advice of counsel, entered a guilty plea to two counts of aggravated murder and in open court admitted the killings. He later challenged his conviction in part on the prosecution's failure to disclose that a handgun was found in the pants pocket of one of the victims, information supporting a self-defense claim that Campbell contended he would have taken to a jury.

The Sixth Circuit assumed without deciding "that under *Brady v. Maryland* if Campbell had gone to trial and been convicted without the suppressed evidence having come to light, a violation of his Fourteenth Amendment due process rights would have been established." *Id.* at 318.[6] The court believed the evidence was probably material and exculpatory in nature, and "also important to Campbell's attorney, both because it was requested and because it certainly could have borne upon the defense counsel's negotiating power in arriving at a plea." *Id.* The court phrased the issue as "whether this nondisclosure renders involuntary Campbell's otherwise voluntary plea, given without knowledge of this evidence." *Id.*

After a detailed examination of *Tollett* and its ancestors, the *"Brady* trilogy,"[7]

---

4. In this vein, it has been held that "[t]he staff of the prosecution, including law enforcement and investigative personnel, must be seen as a unit." *Fambo v. Smith*, 433 F.Supp. 590, 598 (W.D.N. Y.), *aff'd*, 565 F.2d 233 (2d Cir.1977) (per curiam).

5. Discussions of the relevant issues (except for the *Alford* aspect) also appear in *Fambo*, 433 F.Supp. 590, and *United States v. Wolczik*, 480 F.Supp. 1205 (W.D.Pa.1979).

6. The Sixth Circuit later noted, however, that "it is uncertain whether Campbell could have

shown the prejudice necessary to prove such a violation" in light of conduct strongly negating any self-defense theory. 769 F.2d at 322. The court also noted it was not clearly established "that suppression of *Brady* material *prior to trial* amounts to a deprivation of due process." *Id.* (emphasis in original).

7. The "trilogy" consists of *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (not to be confused with *Brady v. Maryland*), *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct.

the Sixth Circuit concluded that "the Supreme Court did not intend to insulate all misconduct of constitutional proportions from judicial scrutiny solely because that misconduct was followed by a plea which otherwise passes constitutional muster as knowing and intelligent." *Id.* at 321.[8] The Sixth Circuit believed the proper approach was to "evaluate[ ] the validity of the challenged plea in light of all the attendant circumstances," including "the assistance of. counsel, a plea-taking procedure compliant with *Boykin v. Alabama*, [395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969),] and a factual basis for the plea." *Id.* at 323–24. The court emphasized that Campbell's "own statements at the plea proceeding * * * fully established his factual guilt" and were "entitled to great weight." *Id.* at 321–22.

Acknowledging that the suppressed evidence was unavailable to aid Campbell and his attorney in evaluating the chance for success at trial, the Sixth Circuit pointed out that

> a plea decision is not made with any perfect knowledge of the results were a trial to be held. * * * By entering the plea Campbell was foregoing the possibility that any [unpredicted] events would have resulted in a not guilty verdict. Certainly the knowledge of the gun's presence was important to Campbell and his attorney, but we cannot say it would have been controlling in the decision whether to plead. Especially given Campbell's own statements at the time of the plea, the constitutional wrong, if such it was, did not compromise either

the truth or the voluntary and knowing nature of the plea.

*Id.* at 324.

Thus, under the Sixth Circuit's approach, the *Tollett* line of cases does not preclude a collateral attack upon a guilty plea based on a claimed *Brady* violation, but habeas relief would clearly be the rare exception. We adopt this approach as our analytical framework. Of the factors which *Campbell* considered in evaluating the plea, neither the competence of counsel's advice nor the propriety of the plea-taking procedure is at issue here.

#### C. Factual Basis for Plea

Unlike Campbell, White never admitted committing the charged offense. His admissions at the plea proceeding did *not* fully establish his factual guilt, because he denied the element of interstate transportation. The factual basis for that element was provided through the government's statement that Noble would testify at trial (and had testified at the July 2 bond revocation hearing) that on one occasion White drove him from Missouri into Kansas for paid sexual activity.

On direct appeal this court decided that, as the record then stood, the government had presented sufficient evidence on the interstate element to support the district court's acceptance of the plea. The present issue concerns the effect of Noble's recantation and the undisclosed evidence on the sufficiency of the factual basis.

---

1458, 25 L.Ed.2d 785 (1970). As the Sixth Circuit read them, these decisions held that an otherwise voluntary and intelligent guilty plea, made with effective assistance of counsel and a factual basis fully establishing guilt, does not become involuntary merely because "it was induced in part by some impermissible cause amounting to a constitutional violation." 769 F.2d at 319.

**8.** The district court in *Fambo* arrived at a similar conclusion. 433 F.Supp. at 594. For guidance in applying the rules of *Tollett* and the *Brady* trilogy, the district court looked to *Menna v. New York*, 423 U.S. 61, 62 n. 2, 96 S.Ct. 241, 242 n. 2, 46 L.Ed.2d 195 (1975), which stated that those cases do not mean "that counseled

guilty pleas inevitably 'waive' all antecedent constitutional violations," but that such a plea "is an admission of factual guilt so reliable that, where voluntary and intelligent, it * * * renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt." The district court concluded that *Tollett* and the *Brady* trilogy do not bar consideration of a claim that the guilty plea "was not valid when entered into because [, based on a *Brady v. Maryland* violation,] it was not voluntary, knowing and intelligent." 433 F.Supp. at 594. *See also Wolczik,* 480 F.Supp. at 1211 (adopting case by case approach to evaluating validity of guilty plea in face of *Brady v. Maryland* claim).

In his October 1985 deposition Noble declared, while under oath and subject to cross-examination by government counsel, that White had never transported him across state lines for purposes of prostitution. White argues that the truth of the deposition statement (and the falsity of Noble's previous interstate claim) is supported by the facts, undisclosed at the time of his plea, that Reilley had implied to Noble immediately after his arrest that a favorable disposition of the burglary charge would result from Noble's cooperation in the White investigation, and that Noble had expressly and consistently denied interstate transportation to Reilley until after the meeting with the state prosecutor in Reilley's car regarding the burglary charge. (We will refer to these facts as the "Reilley evidence.")

White treats Noble's recantation as dispositive of the interstate element. As the district court pointed out, however, the 1985 deposition was not the first time Noble had denied interstate transportation (e.g., White obtained such a denial in the sworn statement Noble signed in May 1982), and inconsistent statements affect a witness's credibility rather than invalidate a conviction. This latest recantation, even buttressed by the "Reilley evidence," does not *necessarily* render Noble's interstate claim false, disprove interstate transportation, or negate the trial court's power to adjudicate White guilty upon his *Alford* plea. *Cf. United States v. Davis*, 516 F.2d 574, 577–78 (7th Cir.1975) (acceptance of *Alford* plea not foreclosed by defendant's claim that prosecution witnesses would testify falsely to secure immunity from prosecution, where proof of guilt was strong); *Batsell v. United States*, 403 F.2d 395, 401 (8th Cir.1968) (evidence, otherwise corroborated, not insufficient merely because witness gives contradictory testimony), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969).

The district court obviously did not believe that the plea's factual basis was undermined by any undisclosed evidence or Noble's deposition testimony. The court stated that it had accepted White's plea with the understanding that the interstate element was disputed, and that "[t]he relative strength of the parties' positions on that issue was irrelevant." Order at 13.

██ The Eighth Circuit recognizes that, although "the factual basis requirement rests in Fed.R.Crim.P. 11(f), * * * a factual basis may be constitutionally required when the guilty plea is accompanied by claims of innocence." *Wabasha v. Solem*, 694 F.2d 155, 157 (8th Cir.1982). Citing *Alford*, this court has stated that "[a]s long as there is in fact a strong factual basis supporting a guilty plea, it is valid even if the defendant protests his innocence." *White Hawk v. Solem*, 693 F.2d 825, 829 (8th Cir.1982), *cert. denied*, 460 U.S. 1054, 103 S.Ct. 1505, 75 L.Ed.2d 934 (1983). This court has defined "factual basis" in terms of "sufficient evidence at the time of the plea upon which a court may reasonably determine that the defendant likely committed the offense." *Gregory v. Solem*, 774 F.2d 309, 312 (8th Cir.1985), *cert. denied*, 475 U.S. 1088, 106 S.Ct. 1475, 89 L.Ed.2d 730 (1986). In the present case, even considering Noble's recantation and the "Reilley evidence," we conclude that the factual basis requirement is satisfied.

### D. Effect of *Brady* Material on Plea Decision

██ We believe that the "Reilley evidence" was significant and that it should have been disclosed but was not. We will assume without deciding that, if a trial had been conducted without this evidence, its nondisclosure would fall within the *Brady* rule because of its effect on Noble's credibility as the sole witness on interstate transportation. *See Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 765–66.

The record fairly supports White's position that he did not receive a copy, or become aware, of Reilley's memorandum of his February 20 jailhouse meeting with Noble until long after the plea hearing. The memorandum reveals that Reilley intended to use the burglary arrest—and, implicitly, the influence he might have on its disposition—as leverage to gain Noble's cooperation in the White investigation. It is not

clear that the referenced "investigation" encompassed all of White's activities which ultimately were charged as crimes, whether state or federal, but because Reilley was the principal agent in both the state and federal investigations, Noble's cooperation could (and did) affect both.

The state in fact declined to prosecute the burglary charge after Noble's meeting with McGarry in Reilley's car, his testimony before the state grand jury, and his claim to Reilley of interstate transportation. Though White learned of the car meeting from Noble prior to the plea, he was unaware of its origins. Moreover, Reilley's admitted failure to make any report of the event (despite his reporting arrangement with the state investigating officer, Myers) indicates his desire for secrecy.

Thus, Reilley's role in eliciting or inducing Noble's claim of interstate transportation was not disclosed to White for his use in arriving at a plea. *See Campbell*, 769 F.2d at 318. Apparently it was likewise undisclosed to government counsel, because Larsen represented to the court at the July 2 hearing that the government had no "deals" with Noble for his testimony. Reilley, who was present at the hearing, did not dispute that representation.

In addition, Reilley failed to include in any of his investigative reports that, in response to Reilley's questions, Noble expressly denied interstate transportation until March 5, 1982, after Noble's meeting with McGarry and his grand jury testimony. Reilley also did not correct Noble when he testified at the July 2 hearing that he (Noble) had already given all of his statements before the meeting with McGarry (which left the false impression that his interstate claim preceded that meeting). This undisclosed information regarding the sequence of events and its implications for the motivation and validity of Noble's interstate claim was not available to White for his plea decision.

The remaining question is whether White's knowledge of the undisclosed material would have affected his decision to forego trial. While the nondisclosure less-ened White's ability to evaluate the chance for success at trial, *see Campbell*, 769 F.2d at 324, the information that *was* available to him at the time convinced White to plead guilty. He indicated at the plea hearing that he would not want to risk a jury verdict based on Noble's anticipated testimony. White knew then that Noble's credibility could be easily attacked—that Noble had given different stories to different people, and that the burglary charge had been dropped after Noble testified before the state grand jury. The undisclosed information would have merely fortified White's position that Noble's testimony was unreliable and motivated by self-interest. Therefore, "we cannot say it would have been controlling in the decision whether to plead." *Id.*

Another factor not considered in *Campbell* but on which the district court focused was the benefit to White in pleading guilty, i.e., that numerous state charges would be dismissed and other federal charges would not be pursued. White stated at the plea hearing that after reviewing the federal and state files, he had concluded it was "in [his] best interest to terminate all of the litigation as quickly as possible" and it was for that reason he was tendering his *Alford* plea. The district court was unconvinced that any undisclosed information would have altered White's decision to plead guilty. Although the "benefit" factor is not determinative, we agree it does not undermine our conclusion here that White's conviction based on his plea of guilty should stand.

Accordingly the judgment of the district court is affirmed.