**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 31 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

KENNETH J. WALTERS, also known as Ken-Dog,

      Defendant-Appellant.

No. 00-4107

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 99-CR-513ST)**

---

Edward R. Montgomery, Salt Lake City, Utah, for Defendant-Appellant.

Veda M. Travis, Assistant United States Attorney (Paul M. Warner, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **EBEL**, **PORFILIO** and **HENRY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Defendant-Appellant Kenneth J. Walters pled guilty to illegal possession of a firearm after a domestic-violence conviction, in violation of 18 U.S.C. § 922(g)(9). On appeal, he alleges four errors: (1) the government violated due

process by failing to disclose reports relevant to his sentence enhancements; (2-3) the district court erred by enhancing his sentence for possessing a stolen firearm and for possessing a firearm in connection with another felony, see USSG § 2K2.1(b)(4), (b)(5); and (4) the district court failed to rule on his motion for a reduced sentence due to the victim's conduct, see USSG § 5K2.10.

We AFFIRM that the government did not violate Walters's due process rights. Further, we AFFIRM the district court's decisions to enhance Walters's sentence. Finally, we REMAND for the district court to consider in the first instance whether § 5K2.10 applies in this case.

## BACKGROUND

A. The Assault, the Truck, and the Handgun

    1. The Assault of Nickilynn Avery and Walters's Arrest

On August 13, 1999, Salt Lake County Sheriff's deputy Gene Van Roosendaal responded to a domestic assault complaint in Kearns, Utah. Nickilynn Avery ("Avery") reported to him that Walters had assaulted her in his camper, and that she had fled to a neighbor's house only after Walters fell asleep. Officers noticed that Avery had severe swelling and bruising on her arms, ear, face, and the top of her head, as well as swelling, bruising, and puncture wounds on her hands. Avery recounted that Walters had beaten her with his fists, and that

the puncture wounds on her hands were made by the rings Walters wore, which had protruding metal ornaments.

Avery told officers that Walters had been driving an older model red-and-white pickup truck and was staying in a camper trailer parked next to his brother's house in Kearns. She warned the officers that Walters had a gun, was "out of his mind," and was addicted to methamphetamine.

Officers found the truck and the camper trailer at the address Avery had given. The door to the trailer was open, allowing officers to see Walters sleeping inside. After attempting to wake him by shouting through the open door, two officers entered, physically woke Walters up, and placed him in handcuffs for officer safety. Deputy Van Roosendaal asked him about the gun, and Walters initially denied possessing it. Confronted with Avery's statement to the contrary, however, Walters admitted he had one under the front seat of the pickup truck. The officers found it – a loaded, Ruger P89 9 mm semiautomatic handgun – as well as three other 9 mm magazines in the cab of the truck.[1] Officers then

_____

[1]Walters suggests in his Opening Brief that the officers violated his constitutional rights by arresting him without a warrant and by interrogating him without having given him <u>Miranda</u> warnings. Indeed, as noted below, on October 15, 1999, Walters filed a motion to suppress the gun and his statements from that night. The district court held an evidentiary hearing on his suppression motion on January 12, 2000. Walters, however, changed his plea to guilty before the court ruled on his suppression motion. Walters does not advance as one of his listed issues on appeal that police violated his constitutional rights on the night of

(continued...)

- 3 -

arrested Walters for committing two state-law crimes: assault with intent to commit serious bodily injury and carrying a concealed, loaded firearm in a vehicle.[2]

2. Scott Center's Pickup Truck and the Check Forgery Scheme

Officers also asked Walters about the pickup truck. Walters admitted the truck was not his, but he insisted it belonged to a friend, whose name Walters would not give. Officers ran checks to determine its owner and whether it was stolen. They discovered that it was registered to Carol Eggett of Bountiful, Utah, and that it was not listed as stolen on the FBI's National Crime Information Center computer.

Subsequent investigation, in September 1999, revealed that Eggett had bought the $11,000 truck for her grandson, Scott Center, because Center's poor credit history prevented him from financing it himself. Eggett bought it for Center, in part, because he had just finished drug and alcohol rehabilitation and she hoped it would enable him to keep a legal job and not begin using drugs again.

---

[1](...continued)
August 13, 1999, so he has waived that issue. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990).

[2]These charges were later dismissed pursuant to a plea agreement in an unrelated case.

Center testified at the January 2000 suppression hearing that Walters took the truck as leverage to get Center to pay a $2000 debt owed to Walters after a payroll-check forgery scheme failed. Center explained that in June 1999 Walters gave him and an individual known as "Demon-Dog" twenty blank payroll checks which had been stolen from a construction company. Center, who had experience passing forged checks, was supposed to teach Demon-Dog the trade. Center later discovered that Walters expected them to cash the checks for at least $500 each and that he demanded a 20% cut, for a total of $2000.

When Center and Demon-Dog attempted to cash the first check, however, Center felt the bank teller was stalling and told Demon-Dog they should leave. Demon-Dog insisted on staying, so Center exited the bank and waited for Demon-Dog in the truck parked outside. As police arrived, Center left. Demon-Dog was arrested.

When Center called Walters later that afternoon to explain what happened, Walters told him, "You better not run into me." Center knew of Walters's reputation and criminal history, including convictions for multiple assaults and illegal weapons possession. At 2 a.m. that morning, Center was lured by a young woman into an apartment where Walters and Demon-Dog were waiting. They told Center that they were going to "have fun" with him. Walters had a hammer on his belt; Center had heard him say he used it to crack ribs. Demon-Dog hit Center,

- 5 -

breaking his nose. They let Center leave without further injury, though, after he paid a "ransom" of $200.

A few days later some of Walters's "people" caught Center and brought him to Walters at a car wash because Center had not yet paid Walters the $2000 from the check forgery scheme. They drove to Walters's trailer, where Walters demanded the $2000 while he menacingly wiped down a gun and placed it in front of Center. Walters eventually let Center go that day without having paid the debt.

One morning a few days later Center was sleeping in a chair and was awakened by Walters, who was pointing a knife at him. With Walters was Julie Perry, the woman who had stamped the signature on the stolen payroll checks. Ostensibly, Perry convinced Walters to let her and Center go "raise money." After a while, Perry persuaded Center to loan her his truck for about an hour. Perry never returned the truck to Center, and when he saw her a few days later she told him she had given the truck to Walters.

Days after that, Center saw Walters with the truck, and Walters told him that once he paid the $2000 Walters would return his truck. Center retorted that he would try to come up with $2000, but he would not pay Walters "extortion money" for the truck. A couple of months later, in December 1999, a Salt Lake City detective found the truck, stripped down, in a vacant lot in the warehouse

district.  There was visible damage to the interior of the truck and numerous parts had been removed, including the tires, rims, and seats.

### 3. Richard M. Gowers's Handgun and its Chain of Possession

Meanwhile, investigation of the gun took a similar trajectory.  On either August 13 or 14, 1999,  Deputy Van Roosendaal ran a check to see if the gun had been reported stolen, and the computer reported it had not been.  The FBI agent assigned to the case, Agent Montefusco, further investigated whether the gun was stolen.  The agent interviewed the gun's owner, Richard M. Gowers, who said that it had been missing since June or July of 1998.  Gowers did not report the gun stolen, however, because he suspected that his son, Robbie Gowers, who was seventeen in 1998, had taken it.

Robbie admitted to the agent that he had taken the gun in July 1998; he said he took it for the purpose of shooting rabbits.  According to Robbie, he loaned the gun to his stepbrother-in-law, Justin Montoya, but Montoya never returned it, even after Robbie asked him for it several times.  Montoya, in contrast, told the agent that he intended to buy the gun from Robbie for $200, but he admitted that he never paid for it.  He also reported that a few days after he received the gun he traded it to a man known only by his first name, Ryan, for one-quarter ounce of methamphetamine.  With this information, FBI agents interviewed Walters again,

who stated that, to his knowledge, a person named Ryan owned the gun. He admitted at his change-of-plea hearing that he possessed the gun while driving the truck.

B. Procedural History and Discovery

1. Indictment

Based on two misdemeanor domestic assault convictions from 1995, on September 8, 1999, a federal grand jury indicted Walters for illegal possession of a firearm after a domestic-violence conviction, in violation of 18 U.S.C. § 922(g)(9). On October 15, 1999, Walters filed a motion to suppress the gun and the statements he gave to police on August 13, 1999. The first hearing on this motion to suppress was held on November 15, 1999, but it was continued when the court learned that the government had sent two FBI 302 reports – on Eggett and Center – so late that Walters had received them the day before the hearing. Obviously frustrated, the court told the government to "[g]o through [the evidence] again and make damn sure everything is furnished that should be." After the continued suppression hearing was completed on January 12, 2000, the court ordered the parties to provide further briefing and took the motion to suppress under advisement. Walters changed his plea to guilty on March 8, 2000, before the court ruled on his suppression motion.

At the outset of this case, the government had an "open file" policy. A little over a month into discovery, however, the government sought a protective order to prevent disclosure of a report dated September 20, 1999, summarizing an interview with Avery in which she implicates Walters in a host of criminal activity. The government was concerned that if Walters knew of Avery's statements, he would try to hurt her. The district court granted this limited protective order, requiring that the report be turned over to Walters two weeks prior to trial.

### 2. Sentencing and the Withheld Reports

The probation office prepared a presentence report ("PSR") recommending, among other things, that Walters receive a four-level enhancement for possessing a firearm in connection with a felony, viz., possessing a stolen truck (Center's), see USSG § 2K2.1(b)(5), and a two-level enhancement for possessing a stolen firearm (Gowers's), see USSG § 2K2.1(b)(4). Walters did not challenge the accuracy of the relevant facts contained in the PSR. Therefore, under the law of this circuit, they are deemed admitted as true. See United States v. Graves, 106 F.3d 342, 344 (10th Cir. 1997).

Walters complains, however, that the government violated Walters's due process rights by failing to turn over during discovery FBI 302 reports which

support the two sentencing enhancements he challenges on appeal. It is undisputed that the government did give to Walters the Deputy Van Roosendaal report regarding both his interview with Avery on the night of the assault and his statement that the computer check did not reveal that the gun was stolen. However, Walters objects, first, that the government failed to disclose two reports which, he alleges, could have been used to impeach Avery: (1) a subsequent interview of Avery by an FBI agent[3] and (2) an interview with Avery's mother in which she describes what Avery told her about the night of the assault. Second, Walters complains the government failed to turn over the report detailing the FBI's subsequent investigation of Gowers's handgun.[4] It was this report that provided the factual basis for the PSR's conclusion that the gun was stolen.

In addition to these due process complaints, Walters also moved the sentencing court to consider a reduction to Walters's sentence under § 5K2.10 (Victim's Conduct), arguing that Center's complicity in carrying out the check forgery scheme led to Walters's taking Center's truck.

Despite being "very troubled" by the government's failures to disclose evidence appropriately during discovery, the district court found that both

---

[3]The record is unclear whether this report was covered by the protective order. For the purposes of this appeal, we assume it was not.

[4]The government concedes that a "clerical error" led to it improperly withholding the 302 report regarding the chain of possession of the gun.

sentencing enhancements relevant to this appeal applied.[5]  First, the district court found that Walters possessed Gowers's gun in connection with the felony of unlawfully possessing Center's truck.  The court decided that possessing the gun had the "potential to facilitate" the continued illegal possession of the truck by Walters because it "emboldened" him to keep the truck "vis-a-vis Mr. Center or anyone else for that matter."  Thus, the court determined that § 2K2.1(b)(5)'s four-level enhancement applied.  Second, the district court increased Walters's offense level by two levels under § 2K2.1(b)(4) due to the fact that the gun was stolen. (Vol. VI at 31.)  The district court never addressed Walters's motion for a reduction of his sentence under § 5K2.10.

Walters appealed.

**DISCUSSION**

A. Jurisdiction and Standard of Review

We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) (appeal by a defendant to review a sentence).  We review a district court's interpretation of the Sentencing Guidelines de novo, and its factual findings for clear error. See

_____

[5]The court also applied other enhancements, but they are not relevant to this appeal.

- 11 -

United States v. Swanson, 253 F.3d 1220, 1222 (10th Cir. 2001), cert. denied, Swanson v. United States, --- S. Ct. ----, 2001 WL 1117850 (U.S. Oct. 29, 2001) (No. 01-6394); see also 18 U.S.C. § 3742(e) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.").  We view "[e]vidence underlying a district court's sentence . . ., and inferences drawn therefrom, in the light most favorable to the district court's determination." United States v. Conley, 131 F.3d 1387, 1389 (10th Cir. 1997).

B. Alleged *Brady* Violation due to Withheld Reports regarding Assault on Avery

Walters argues that the government denied him due process as interpreted by Brady v. Maryland, 373 U.S. 83 (1963), by failing to turn over two reports which he alleges could have been used to impeach Avery.  Walters contends that this error requires that he be allowed to withdraw his guilty plea.  We disagree.

The Brady doctrine provides that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87

- 12 -

(emphasis added).[6] Thus, to establish a Brady violation, a defendant must demonstrate that "(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material." Gonzales v. McKune, 247 F.3d 1066, 1075 (10th Cir. 2001).

"[A] defendant who has pleaded guilty may thereafter only challenge the voluntariness of his plea." United States v. Wright, 43 F.3d 491, 495 (10th Cir. 1994) (citing United States v. Broce, 488 U.S. 563, 569 (1989)). This court has held that "under certain limited circumstances, the prosecution's violation of Brady can render a defendant's plea involuntary." Wright, 43 F.3d at 496, although "habeas relief would clearly be the exception." "In the context of an attack on the validity of a plea, evidence is considered material where there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998) (quotation marks and citation omitted); cf. Hill v. Lockhart, 474 U.S. 52, 59 (1985) (stating that to demonstrate "prejudice" in the context of ineffective assistance of counsel during the plea process a "defendant must show that there is

---

[6]Accordingly, we reject the government's suggestion that Brady does not apply to "reports related only to . . . sentencing enhancements."

- 13 -

a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"). "Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information." Avellino, 136 F.3d at 256 (quotation marks and citation omitted).

Assuming, without deciding, that the two withheld reports provide material for impeaching Avery, we conclude that the government's action in not disclosing them, while distressing, was not material. There is no objective evidence that had Walters had the two reports he would have insisted on going to trial.

Walters argues that being able to impeach Avery was important because "she would have likely been the only witness who could have connected Mr. Walters and the gun." Cf. Avellino, 136 F.3d at 256 ("In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime."). Walters overlooks, however, that he admitted to Deputy Van Roosendaal that he had a gun in the truck and that police then found that gun. On appeal, he does not challenge this evidence as improperly admitted. Therefore, Walters's only reason for impeaching Avery is irrelevant. Hence, the reports are not material and no Brady violation occurred.

C. "Stolen Gun" Sentence Enhancement

Walters next contends that the district court erred in applying a two-level sentencing enhancement pursuant to § 2K2.1(b)(4) of the Sentencing Guidelines. Section 2K2.1(b)(4) requires a two-level enhancement "if any firearm was stolen, or had an altered or obliterated serial number." "The enhancement under subsection (b)(4) for a stolen firearm . . . applies whether or not the defendant knew or had reason to believe that the firearm was stolen . . . ." USSG § 2K2.1, cmt. n. 19.

Walters argues that: (1) the government's failure to turn over the FBI 302 report pertaining to the chain of custody of the gun constitutes a violation of his due process rights, and therefore the district court erred in considering this evidence, or, alternatively, Walters should be permitted to withdraw his guilty plea; (2) he should be entitled to withdraw his plea under an estoppel defense to the plea agreement based on Utah contract law; and (3) the evidence was insufficient to support an inference that the gun was stolen.

1. Due Process Claims

"This court reviews de novo whether a violation of a defendant's due process rights occurred." United States v. Fria Vazquez Del Mercado, 223 F.3d 1213, 1214 (10th Cir. 2000), cert. denied, Fria Vazquez Del Mercado v. United

States, 531 U.S. 1027 (2000). Walters advances two theories for his argument that the government violated his due process rights by failing to disclose the report discussing the chain of possession of the gun. First, he argues that the government's failure to disclose the report indicating the gun was stolen, after it had turned over Van Roosendaal's report stating it was not, is antithetical to "the fundamental maxim of fairness" that sits "[a]t the very core of the Due Process clause." Second, Walters contends that the government's failure to disclose this evidence constitutes a Brady violation.

### a. Fundamental Fairness

Walters argues that it is fundamentally unfair for the government to make an affirmative representation that the gun was not stolen, to contend that it was operating under an "open file" policy, and then to fail to forward a subsequent report showing that the gun was likely stolen. Walters fails to cite any authority for his position, and we could not find any ourselves. Furthermore, this claim – that the government violated due process by failing to turn over evidence – is, in essence, merely re-packaging and seeking to extend Brady. In the absence of any authority, we decline to extend Brady and, instead, turn to that claim itself.

### b. *Brady*

We repeat: To establish a <u>Brady</u> violation, a defendant must demonstrate that "(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material." <u>Gonzales v. McKune</u>, 247 F.3d 1066, 1075 (10th Cir. 2001). Walters fails to establish that the suppressed report was favorable or material. As to the former, Agent Montefusco's report tracing the gun's chain of possession from Richard M. Gowers to "Ryan" to Walters is not favorable to Walters. The report certainly is not exculpatory; in no way does it justify, excuse or clear Walters from guilt for the crime to which he pled guilty – possessing a firearm by a person convicted of domestic violence. The report is irrelevant as to that crime, and it is inculpatory as to the sentencing enhancement for possessing a stolen gun, USSG § 2K2.1(b)(4).

Walters argues that this report contains favorable evidence because it would have enabled him to impeach Robbie Gowers as a thief and drug user. Impeaching Robbie is irrelevant (and, therefore, immaterial) to both Walters's conviction and the "stolen gun" enhancement. There is no objective evidence that had the government disclosed the report to Walters before he changed his plea, Walters would not have pled guilty but would have insisted on going to trial. <u>See</u> <u>Avellino</u>, 136 F.3d at 256. Assuming, for the sake of argument, that Walters could have used this report thoroughly to discredit Robbie's testimony at trial,

that fact would have had no effect on the jury's deliberations regarding whether Walters was guilty of illegal possession of a firearm by a person convicted of domestic violence or whether Walters possessed a stolen firearm in violation of USSG § 2K2.1(b)(4). Therefore, there is no reason to believe that had Walters possessed this report he would not have pled guilty.

Walters counters that "when he was considering his decision to change his plea [from not guilty to guilty] he did so under the mistaken belief that the 2K2.1(b)(4) enhancement would not apply." However, he does not establish that anyone gave him assurances that the 2K2.1(b)(4) enhancement would not apply. Further, reporting to Walters that a computer check did not reveal the gun stolen is far from an assurance that the gun was not in fact stolen. Walters's affirmative responses to the district court's questions at his change-of-plea hearing are instructive:

> COURT: I presume, Mr. Walters, that you believe there is some benefit to you entering a plea of guilty . . . . Whatever benefit you believe exists, however, is not a reason to plead guilty. You should plead guilty only if you are guilty and for no other reason. Do you understand that?
>
> WALTERS: Yes.
>
> * * *
>
> COURT: Do you understand that the maximum possible penalty of the crime to which you are entering a plea of guilty, [in] violation of 18 U.S. Code Section 922(g)(9), is: Ten years of imprisonment, and a fine of $250,000, or both . . . ?

WALTERS: Yes.

* * *

COURT: Do you understand that if your attorney or anyone else has attempted to estimate or predict what your sentence will be, that their estimate or prediction could be wrong?

WALTERS: Yes.

COURT: No one, not even your attorney or the government, can nor should give you any assurance of what your sentence will be because that sentence cannot be determined until after the probation office report is completed and I have ruled on challenges to the report and determined whether I believe there are grounds to depart, up or down, from the guideline range. Do you understand that?

WALTERS: Yes.

COURT: You also fully understand that even if your sentence is different from what your attorney or anyone else told you that it might be, or if it is different than what you expect, you will still be bound to your guilty plea and you will not be allowed to withdraw your plea of guilty?

WALTERS: Yes.

* * *

COURT: Do you understand that . . . I am completely free to disregard the government's recommendation or position and to impose whatever sentence I believe is appropriate under the circumstances and guidelines and you will have no right to withdraw your plea?

WALTERS: Yes.

COURT: Do you understand then that if the sentence is more severe than expected but within the guidelines, you cannot withdraw the plea?

WALTERS: Yes.

COURT: I find that the defendant understands the charge against him and understands the rights he's waiving by agreeing to the plea agreement.

Walters does not allege that this Rule 11 colloquy was insufficient or that, besides his Brady claim, he entered his guilty plea involuntarily or with insufficient knowledge. It is well established that a defendant's dissatisfaction with the length of his sentence generally is an insufficient reason to withdraw a plea. See United States v. Elias, 937 F.2d 1514, 1520 (10th Cir.1991).

Therefore, we reject Walters's claim that the government's failure to turn over Agent Montefusco's report regarding the gun being stolen violated Brady.

2. Equitable Estoppel Claim

Walters further argues that the trial court erred by not invoking the principle of equitable estoppel to bar the government from relying on Agent Montefusco's report to support this sentence enhancement. Walters contends he relied on both the government's first representation that the gun was not stolen and the government's failure to correct that misunderstanding when he pled guilty.

This argument fails for several reasons. First, Walters failed to raise this argument to the district court, so we review only for plain error. See Jones v.

- 20 -

United States, 527 U.S. 373, 388 (1999). It is clear that the district court did not commit plain error by failing to invoke the principle of equitable estoppel sua sponte to exclude the subsequent report on the gun being stolen. Second, Walters's reliance was not reasonable given the district court's thorough Rule 11 colloquy which expressly warned Walters that he should not plead guilty on the basis of estimations of the length of the sentence he could receive. Finally, this argument strikes us as simply a recycled version of his previous arguments which we reject above. He has not distinguished it in any way, and therefore it appears to fall within Brady. Yet, as we concluded above, the government did not violate Brady because the report was neither favorable nor material.

    3. Walters's Remedies for the Government's Apparent Misconduct

At the close of sentencing, the district court noted that it was "very troubled by the series of events in this case wherein the United States failed to disclose appropriately . . . information to [Walters] as the law would have required." We, too, are troubled by the series of non-disclosures by the government. Walters failed to avail himself, however, of two available remedies at the district court level. First, Federal Rule of Criminal Procedure 16(d)(2) provides,

> If at any time during the course of the proceedings it is brought to the
> attention of the court that a party has failed to comply with this rule

> [regarding discovery], the court may . . . prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

This rule seems tailor-made for this case. Second, Walters could have sought to withdraw his plea, arguing the government's non-disclosures constituted a "fair and just reason" for withdrawal. See Fed. R. Crim. P. 32(e). At oral argument, Walters's counsel stated that he considered, but rejected, moving to withdraw the plea. Perhaps he had good reason to do so. We do not know what off-the-record negotiations took place to secure his plea or what strategic decisions his counsel made which led him to not seek to withdraw the plea. To be sure, however, at the district court level Walters had the tools to remedy what he now contests was government misconduct.

### 4. Factual Finding that Gun was Stolen

The district court found that the gun was stolen. In the context of applying § 2K2.1(b)(4), this court has interpreted the term "stolen" to mean "all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." United States v. Rowlett, 23 F.3d 300, 303 (10th Cir. 1994) (quoting United States v. Turley, 352 U.S. 407, 417 (1957)). The evidence shows that Robbie took the gun from his father, Richard Gowers. Robbie then either loaned

or sold the gun to Montoya. Montoya, in turn, traded the gun to Ryan for a quarter-ounce of methamphetamine. While it may be unclear who in this chain of possession first had the requisite intent to deprive Richard Gowers of the rights and benefits of ownership, it is indisputable that one or more of them did. Therefore, we conclude that the district court did not clearly err in finding that the gun was stolen.

Consequently, we affirm the district court's two-level enhancement for unlawful possession a stolen gun under USSG § 2K2.1(b)(4).


D. "Possessing a Gun in Connection with Another Felony" Sentence Enhancement

Sentencing Guideline § 2K2.1(b)(5) instructs a court to increase by four levels a defendant's base offense level "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." USSG § 2K2.1(b)(5). The district court applied this enhancement, finding that Walters possessed Gowers's gun in connection with the felony of unlawfully possessing Center's stolen truck. The court found that possessing the gun had "the potential to facilitate" the offense of keeping the stolen truck because it "emboldened" Walters to maintain possession of the truck "vis-a-vis Mr. Center or anyone else for that matter." (Citing United States v. Routon, 25 F.3d 815, 817-19 (9th Cir.

1994) and <u>United States v. Hunt</u>, No. 97-3267, 1998 WL 223267, at *2-3 (10th Cir. May 5, 1998))).

We have explained that the "in connection with" requirement of § 2K2.1(b)(5) is analogous to the "in relation to" requirement of 18 U.S.C. § 924(c)(1), which "is satisfied if the government shows that the weapon facilitates or has the potential to facilitate the . . . offense, but is not satisfied if the weapon's possession is coincidental or entirely unrelated to the offense." <u>United States v. Gomez-Arrellano</u>, 5 F.3d 464, 466-67 (10th Cir. 1993) (citing the "expansive" reading of § 924(c) in <u>Smith v. United States</u>, 508 U.S. 223, 238 (1993)); <u>see also</u> <u>United States v. Bunner</u>, 134 F.3d 1000, 1006 (10th Cir.1998).

Here, police discovered the gun under the front seat of the truck, the very thing the district court found Walters illegally possessed and wanted to protect from Center and others. Walters admitted at his change-of-plea hearing that he possessed the gun while driving the truck. Center confronted Walters at least once in an attempt to get his truck back. Avery knew Walters carried a gun, and given Walters's penchant for flaunting weapons and his well-known reputation for violence, it is highly likely that others knew he had a gun as well. Walters somehow obtained the truck from Perry – perhaps by collusion, perhaps by coercion. Taking these facts and observations together, we hold that the district court did not clearly err when it concluded that the gun had the potential to

facilitate Walters's unlawful possession of Center's stolen truck. Therefore, we affirm the district court's application of the four-level enhancement under § 2K2.1(b)(5).

E. Downward Departure for "Victim's Conduct" under USSG § 5K2.10

In his objection to the PSR, Walters argued that if the district court enhanced his base offense level under § 2K2.1(b)(5) it should also reduce the sentence under § 5K2.10 (Victim's Conduct) because Center's "wrongful conduct contributed significantly to provoking" the behavior that led to the § 2K2.1(b)(5) enhancement. The government conceded at oral argument that this issue was properly raised and preserved for the district court. It is undisputed that the district court did not rule on this motion by Walters; it seems to have slipped through the cracks. The government argued on appeal that the district court could not, as a matter of law, depart downward on the ground asserted by Walters.

Walters is entitled to have the district court consider in the first instance whether § 5K2.10 applies. See R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.), 951 F.2d 1175, 1182 (10th Cir. 1991) (stating that as a general rule, an appellate court does not consider issues not ruled upon below, and thus it is appropriate to remand the case to the district court to first

address this issue).  Therefore, we REMAND for consideration of the applicability of Sentencing Guideline § 5K2.10.

## CONCLUSION

We AFFIRM the district court's sentencing enhancements under § 2K2.1(b)(4) (stolen gun) and § 2K2.1(b)(5) (possession of a gun in connection with another felony).  We REMAND for the district court to consider whether Walters qualifies for a sentence reduction under § 5K2.10 (victim's conduct).