FILED
United States Court of Appeals
Tenth Circuit

July 11, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EMMANUEL N. OHIRI,

Defendant - Appellant.

No. 06-2182

(D. New Mexico)

(D.C. Nos. CIV-03-172-MV/ACT
and CR-00-1341-MV)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **EBEL**, and **O'BRIEN**, Circuit Judges.

## I.    Introduction

Proceeding *pro se*, appellant Emmanuel N. Ohiri sought a certificate of

appealability ("COA") from this court to appeal the district court's denial of the

amended habeas corpus motion he filed pursuant to 28 U.S.C. § 2255. We

granted a COA on the following two issues relating to the voluntariness of his

guilty plea: (1) whether the Government's failure to produce a statement made by

a co-defendant constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963)

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

and (2) whether trial counsel provided constitutionally ineffective assistance. Counsel was appointed for Ohiri and the issues were orally argued before this court. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we **affirm** the district court's denial of habeas relief.

## II. Factual Background

Ohiri, John Thomas Morris, and General Waste Corporation ("GWC") were charged in a superceding indictment with a myriad of violations related to the illegal transportation and storage of hazardous waste. *United States v. Ohiri*, 133 F. App'x 555, 556 (10th Cir. 2005). In 2001, Morris pleaded guilty to three counts of making false material statements on hazardous waste manifests. *United States v. Morris*, 85 F. App'x 117, 119 (10th Cir. 2003). The following statement, made by Morris, was attached to his presentence investigation report:

> I was employed at General Waste Corporation (GWC) from July of 1997 to July of 1998. My title was Operations Manager. My responsibilities entailed oversight of the hazardous waste activities, construction debris disposals, and sales. The first two weeks that I joined GWC, Manny Ohiri instructed me to identify, segregate, and label miscellaneous hazardous waste containers. Those containers had been accumulated by GWC waste management activities, and stored in the GWC warehouse prior to my arrival. . . . I do not know how long the regulated material GWC accumulated had been in storage prior to my employment. My participation included recreating false waste manifests for proper off-site disposal of the waste GWC had accumulated prior to my employment. Manny Ohiri was aware of this activity. Once the waste in the warehouse was organized, I started to make sales contacts with hazardous waste accounts I had managed prior to my employment with GWC. My previous employer, Envirosolve Southwest, Incorporated, had an authorization granted by the State of New Mexico to store hazardous

waste, up to 180 days, received from a conditionally exempt small-quantity waste generator [CESQG]. Without this type of authorization, a waste management transporter could only store the waste for no more than ten days. I personally made the decision, of my own accord, to operate GWC as if we were authorized as a 180-day storage and accumulation facility. I created uniform hazardous waste shipping manifests for GWC as the receiving facility. I then remanifested the waste containers, and had GWC designated as a generator for out-bound waste disposal. I intentionally did this for building or aggregating larger outbound shipments for economical reasons. Manny Ohiri was not informed of my waste management strategy and techniques in this particular case. For economical benefits and to increase profit margins related to the account, I would consolidate partial waste containers, mixing waste from multiple CESQGs, reducing outbound disposal container volume. I did this on my own accord, and Manny Ohiri was not informed of this strategy. In order to maintain my waste management accounts and integrity, I would change dates on various small quantity generator manifests, due to the waste facility non-approval status. I would pick up waste without obtaining disposal facility prior approval, and would hold the waste over an extended amount of time, until the approval was in place. I had recreated waste manifests and forged signatures to be in compliance, and to elude the waste generator and disposal facility. Manny Ohiri was not informed of this activity.

*See Ohiri*, 133 F. App'x at 557; *Morris*, 85 F. App'x at 557-58.

In 2002, Ohiri pleaded guilty to Counts 21, 23, and 25 in the indictment. *Id*. At the change of plea hearing, he admitted in open court that he knowingly stored 11,000 pounds of hazardous waste from Four Corners Drilling Company without a permit from February 13, 1998 to May 18, 1999 (Count 21); knowingly transported and illegally stored 225 pounds of hazardous waste from Giant Refining Company from July 17, 1998 to October 15, 1998 (Count 23); and illegally stored 183 pounds of ignitable hazardous waste from iiná bá, Ltd., a

-3-

GWC client, from May 28, 1999 to July 27, 2001 (Count 25). At Ohiri's

sentencing hearing, the Government sought, *inter alia*, a two-level sentencing

enhancement pursuant to U.S.S.G. § 3B1.1(c) based on its position that Ohiri was

an organizer, leader, manager, or supervisor of the illegal activity. *Ohiri*, 133 F.

App'x at 557. In connection with the Government's argument on this

enhancement, the district court read Morris's written statement into the record.

*Id*. The district court ruled in favor of the Government and applied the § 3B1.1

enhancement. *Id*. at 558. Ohiri was sentenced to fifteen months' imprisonment

and a three-year term of supervised release. *Id*. He was also ordered to pay

$42,000 in fines and restitution. *Id*.

After his sentencing, Ohiri retained new counsel who filed a habeas motion

pursuant to 28 U.S.C. § 2255. *Id*. His counsel then withdrew and Ohiri filed *pro

se* objections to the magistrate judge's report and recommendation. *Id*. He also

sought to amend his § 2255 motion. *Id*. The district court denied Ohiri's motion

to amend and dismissed his § 2255 motion. *Id*. This court reversed the denial of

the motion to amend and remanded the matter to the district court. *Id*. at 563-64.

On remand, Ohiri obtained counsel who filed an amended § 2255 motion. The

magistrate judge recommended denying the amended motion. Ohiri's counsel

withdrew and Ohiri thereafter proceeded *pro se*. The district court adopted the

magistrate judge's recommendation and denied habeas relief. Ohiri sought a

COA from this court, which was granted on the two issues raised in his amended

-4-

§ 2255 motion: (1) whether the Government violated *Brady* by failing to provide Ohiri with Morris's statement before the sentencing hearing and (2) whether Ohiri's trial counsel rendered ineffective assistance because of an alleged financial conflict.

## III. Discussion

This court reviews the denial of a § 2255 habeas motion de novo and the district court's factual findings for clear error. *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006). Ohiri asks us to either grant his § 2255 motion or order the district court to hold an evidentiary hearing. An evidentiary hearing is not required when "the motion and the files and records of the case conclusively show that the [movant] is entitled to no relief." 28 U.S.C. § 2255(b).

### A. Alleged *Brady* Violation

Ohiri first argues that the Government's failure to disclose Morris's written statement constitutes a violation of *Brady* and renders his guilty plea involuntary. While this court has recognized that a defendant may collaterally attack a guilty plea based on an alleged *Brady* violation, we have also stated that "even if a *Brady* violation is established, habeas relief would clearly be the exception." *United States v. Wright*, 43 F.3d 491, 496 (10th Cir. 1994) (quotation omitted). To establish a *Brady* disclosure violation, Ohiri must demonstrate: (1) the Government failed to disclose Morris's statement, (2) the statement was favorable to Ohiri as exculpatory, and (3) the statement was material. *United States v.*

-5-

*Walters*, 269 F.3d 1207, 1214 (10th Cir. 2001). Because we conclude Morris's statement was not material, we can resolve Ohiri's claim by assuming, without deciding, that the Government was required to disclose Morris's statement and that the statement was exculpatory.

"In the context of an attack on the validity of a plea, evidence is considered material where there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Id.* (quotation omitted). Ohiri's claim fails because he cannot show a reasonable probability that knowledge of Morris's statement would have persuaded a defendant in his position to insist on going to trial. *See id.* at 1215 (holding the proper inquiry is objective and "asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information" (quotation omitted)).

A twenty-six count superseding indictment was filed on February 13, 2002. Ohiri was named in twenty-five of the counts which charged him with conspiring with Morris to violate the Resource Conservation and Recover Act, knowingly storing hazardous waste from several generators without a permit, knowingly transporting hazardous waste without a hazardous waste manifest, knowingly making false material statements on hazardous waste manifests, knowingly concealing hazardous waste manifests from state inspectors, transporting hazardous waste in a rental truck without the required warning placards, engaging

in mail fraud, and removing and destroying hazardous waste labels from containers of hazardous waste to prevent their seizure. Based on the appellate record, Morris's written statement appears to provide a valid defense to some of the individual charges against Ohiri, particularly Count 25, to which he pleaded guilty, and similar charges alleging that waste was knowingly stored without the appropriate permits. The statement, however, clearly has no direct relevance to several of the charges, including the allegation in Count 7 that Ohiri concealed hazardous waste manifests from state inspectors, the claim in Count 8 that he permitted hazardous waste to be transported without the required placards, and the allegation in Count 24 that he removed warning labels from containers of hazardous waste.

The record also reveals that Morris's statement does not support Ohiri's defense to two of the three counts to which he pleaded guilty. Count 21 charged Ohiri with illegally storing waste from Four Corners Drilling Company from February 13, 1998 to May 18, 1999. Ohiri alleges in his opening brief that he had no knowledge of this violation because Morris picked up this waste and his statement confirms that he secreted it on GWC's property without Ohiri's knowledge. Ohiri alleges he disposed of the waste as soon as practicable after he discovered it on the property. In his affidavit attached to his amended § 2255 motion, however, Ohiri admits he knew about this waste many months before it was removed from GWC's property on May 19, 1999:

> The waste streams [from Four Corners Drilling Company] were
> picked up by Mr. Morris on February 13, 1998. . . . Unbeknownst to
> me, Mr. Morris left the waste hidden in the truck. This waste was
> discovered by EPA inspectors on November 13, 1998. I personally
> did not know of this waste until several weeks later, when I gave
> [GWC's counsel] a tour of the facility.

Thus, notwithstanding Morris's statement that Ohiri was unaware of the Four Corners waste, Ohiri's sworn admission establishes that he knowingly held the waste for more than ten days after discovering it. *See* 40 C.F.R. § 264.1(g)(9) (exempting transporters storing certain waste for ten days or less from compliance with certain hazardous waste regulations).

Count 23 charged Ohiri with knowingly storing 225 pounds of hazardous waste from Giant Refining Company from July 17, 1998 to October 15, 1998. At his change of plea hearing, Ohiri admitted knowingly storing this waste for more than ten days but in his affidavit he stated,

> [GWC employee] Lucas Maestas had acted under Mr. Morris's
> instructions to pick up waste stream from the Giant Refinery. Mr.
> Maestas had worked with Mr. Morris at Enviro-Solve. The Giant
> Refinery waste stream was not shipped to the [treatment, storage, and
> disposal facility]. The waste was abandoned at GWC by Mr. Morris
> without my knowledge or consent. When the waste was discovered,
> it was returned to the generator.

The record, however, demonstrates that Morris stopped working at GWC on July 11, 1998. The waste from Giant Refinery was picked up on July 17, six days later. Ohiri has not presented any corroborating statement from Mr. Maestas and there is no explanation of how Morris exercised supervisory control over Mr.

Maestas during a time when Morris was no longer employed by GWC. Neither does the record indicate how Morris could "abandon" the waste at GWC without Ohiri's knowledge when Morris left the company before the waste was picked up.

In addition, Morris's statement supports rather than refutes at least some of the conspiracy allegations in Count 1. There is evidence in the record that Ohiri was alerted to Morris's illegal waste management activities no later than March 9, 1998. On that date, Ohiri wrote a letter to iiná bá, Ltd., acknowledging he was aware Morris had recreated manifests to give the appearance that GWC was holding hazardous waste no longer than ten days. In the letter, Ohiri represented that he was "personally assuming complete oversight of Mr. Morris's activities and waste management issues." The conspiracy charge, which was dismissed pursuant to the terms of the plea agreement, contained allegations relating to the creation of five hazardous waste manifests by Morris containing false information, all of which were dated after March 9, 1998, *i.e.*, the date on which Ohiri, by his own admission, began personally supervising all of Morris's activity. The conspiracy charge also alleged that Morris created and signed several false manifests during the first few weeks of his employment with GWC.[1] In his written statement, Morris alleged that he spent the first two weeks of his

[1]Although the superceding indictment states that Morris began working at GWC on or about June 1, 1997, Morris's written statement indicates his employment began in July 1997. In the Government's Second Notice of Intent to Offer Proof, Morris's first day of employment was represented to be June 23, 1997.

employment at GWC disposing of hazardous waste that had accumulated in GWC's warehouse. According to Morris, his participation involved "recreating false waste manifests for proper off-site disposal of the waste GWC had accumulated prior to [his] employment." He also clearly stated that Ohiri was aware of this activity.

Our review of the entire record, thus, reveals the existence of evidence that greatly diminishes the persuasiveness of Morris's statement as to Ohiri's claims of absolute innocence. The statement is irrelevant to many of the charges against Ohiri set out in the superceding indictment and supports others. Further, the Government was prepared to present a substantial amount of evidence supporting its theory that Ohiri knew hazardous waste was being illegally stored on GWC property.[2] This evidence included a proffer that (1) Mark Coffman, an inspector with the New Mexico Environment Department (NMED), personally observed Ohiri mislabeling drums containing hazardous waste,[3] (2) Ohiri instructed five GWC employees to remove hazardous waste from GWC property in the middle of the night for the purpose of hiding it from NMED inspectors, and (3) Ohiri falsely

---

[2]On its own motion, this court has supplemented the record with Ohiri's plea agreement and the Government's Second Notice of Intent to Offer Proof. *See* Fed. R. App. P. 10(e)(2)(C).

[3]It appears this waste was the subject of Count 5 of the superceding indictment.

told Mr. Coffman that the first load of hazardous waste ever delivered to GWC was received on August 26, 1997.[4]

We are convinced that even if Morris's written statement had been made available to Ohiri, there is no reasonable probability it would have persuaded him to reject the plea agreement offered by the Government and, instead, insist on proceeding to trial on all twenty-five counts in the indictment. Our review of the entire record reveals a substantial risk he would have been convicted of a considerable number of the counts to which Morris's statement provided little or no support for his defense. Thus, Morris's statement is not material and no *Brady* violation occurred when the Government failed to provide the statement to Ohiri.

**B.     Alleged Ineffective Assistance of Counsel**

Ohiri also relies on allegations of ineffective assistance of counsel to support his claim that his guilty plea was not given freely and voluntarily. Generally, claims of ineffective assistance of counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Hamilton*, 510 F.3d 1209, 1216 (10th Cir. 2007) ("When a defendant's challenge to a guilty plea is based on ineffective assistance of counsel, we apply the two-part test established in *Strickland* . . . ."). The familiar two-prong test set out in *Strickland* requires a defendant to show both that his counsel's performance fell below an

---

[4]This evidence was eventually presented to the district court at Ohiri's sentencing hearing through the testimony of both Mr. Coffman and Jerome Thompson, a GWC employee.

objective standard of reasonableness and that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 687. The claim on which COA was granted, however, was not premised on *Strickland*. Instead, Ohiri argued the $35,000 debt he owed to his trial counsel, John Cline, created an actual conflict of interest between himself and Cline.[5] *See Mickens v. Taylor*, 535 U.S. 162, 171 (2002). According to Ohiri, this conflict led to Cline's failure to (1) engage in pre-trial discovery, (2) investigate possible defenses to the charges against him, (3) adequately interview witnesses, and (4) test the hazardous waste identified in the indictment. Ohiri also argues that because of the debt, Cline pressured him to plead guilty and failed to take appropriate steps to withdraw his guilty plea when Morris's statement was disclosed at the sentencing hearing.

To prevail on this claim, Ohiri must demonstrate a conflict between himself and his counsel "that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171 (emphasis omitted). "An actual conflict of interest results if counsel was forced to make choices

---

[5]Presumably, Ohiri did not proceed under *Strickland v. Washington* in his amended § 2255 motion because he cannot meet the prejudice prong of the *Strickland* test. *Compare Strickland v. Washington*, 466 U.S. 668, 691-92 (1984) (requiring a defendant to show both deficient performance and prejudice) *with Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) (holding prejudice is presumed when a defendant demonstrates that an actual conflict of interest "adversely affected his lawyer's performance"). To the extent his pro se filings in this court include a request for a COA based on *Strickland*, we deny that request both because the argument was not presented to the district court in the § 2255 motion, *Dockins v. Hines*, 374 F.3d 935, 940 (10th Cir. 2004), and because he has failed to show prejudice.

advancing other interests to the detriment of his client." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998). A defendant must do more than allege the potential for a conflict, he must point to "specific instances to support his contentions." *Id.* at 1251; *see also Caderno v. United States*, 256 F.3d 1213, 1218 (11th Cir. 2001) (holding a defendant "must establish that an actual financial conflict existed by showing that his counsel actively represented his own financial interest during [defendant's] trial, rather than showing the possibility of an actual financial conflict"). Thus, we can quickly reject Ohiri's first assertion that the mere existence of the debt gave rise to an actual conflict. *See United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir. 1997) ("[T]he existence of a fee dispute and an attorney's motion to withdraw for that reason do not without more constitute a conflict of interest.").

Ohiri must point to specific examples showing that Cline put his own financial interests ahead of Ohiri's interests. He attempts to meet this burden with an affidavit signed by Cline. Cline stated in this affidavit that (1) Ohiri had paid his firm $41,000 but still owed over $35,000 in fees and costs; (2) he did not retain experts to aid in trial preparation and did not have waste samples tested by independent laboratories because Ohiri could not afford the costs; (3) with the exception of the change of plea hearing, Ohiri at all times denied guilt and was reluctant to plead guilty; (4) he could not remember another case in which he more strongly recommended that a client enter a guilty plea; and (5) if Ohiri's

-13-

case had gone to trial, he would have requested a continuance because he was unprepared to proceed, having just completed a trial in another matter.

Cline's affidavit is insufficient to show the existence of an actual conflict of interest because the statements contained therein, like the simple existence of the debt, show only the possibility of a conflict. Cline does not state that Ohiri's existing debt caused him to forego retaining experts or testing waste samples. Instead, he says those options were not pursued because Ohiri could not afford them. Likewise, he does not say he recommended that Ohiri accept the guilty plea because of the debt and the affidavit does not indicate Cline believed Ohiri was innocent or would be acquitted. To the contrary, Clines states, "I made [it] clear to [Ohiri] that the decision whether to plead guilty or go to trial was his to make." Further, when Ohiri indicated he might want to withdraw his guilty plea, Cline claims he reiterated to Ohiri the reasons that, in his view, "made it advisable for [Ohiri] to have entered the guilty plea in the first place." Finally, although Cline admits he was not prepared to proceed with Ohiri's trial, his statement makes it clear his lack of preparation was the result of his involvement in another matter, not the outstanding debt.

Ohiri makes additional arguments that Cline's representation was inadequate because of the debt, including allegations Cline failed to conduct an adequate investigation or effectively cross-examine witnesses. But, again, he can point to no evidence linking this alleged deficient performance to the existence of

-14-

the debt.  Because Ohiri cannot show an actual conflict of interest between himself and Cline, his ineffective assistance of counsel claim fails.

## IV.    Conclusion

Because "the motion and the files and records of the case conclusively show that [Ohiri] is entitled to no relief," the district court properly resolved Ohiri's habeas motion without an evidentiary hearing.  28 U.S.C. § 2255(b).  The decision of the district court denying habeas relief is **affirmed**.  The Government's motion to strike document 32 from the record and to strike exhibits attached to Ohiri's opening brief is **denied**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge
