IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

No. 14-0642

_____

September 2015 Term

_____

**FILED**

**November 10, 2015**
**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

JOSEPH A. BUFFEY,
Petitioner,

v.

DAVID BALLARD, WARDEN,
Respondent.

_____

Appeal from the Circuit Court of Harrison County
The Honorable Thomas Bedell, Judge
No. 12-C-183-2

REVERSED AND REMANDED WITH INSTRUCTIONS

_____

Submitted: October 6, 2015
Filed: November 10, 2015

Allan N. Karlin, Esq.                          David Romano, Esq.
Allan N. Karlin & Associates                   Assistant Prosecuting Attorney
Morgantown, West Virginia                      James F. Armstrong, Esq.
                                               Assistant Prosecuting Attorney
Nina Morrison, Esq.                            Clarksburg, West Virginia
Barry C. Scheck, Esq.                          Counsel for Respondent
New York, New York
Counsel for Petitioner

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1. "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

2. "On an appeal to this Court the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court." Syl. Pt. 2, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973).

3. "There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial." Syl. Pt. 2, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007).

4.  A defendant's constitutional due process rights, as enumerated in *Brady v. Maryland*, 373 U.S. 83 (1963), extend to the plea negotiation stage of the criminal proceedings, and a defendant may seek to withdraw a guilty plea based upon the prosecution's suppression of material, exculpatory evidence.

5.  "A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor.  Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor." Syl. Pt. 1, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007).

Workman, Chief Justice:

Mr. Joseph A. Buffey (hereinafter "Petitioner") appeals a June 3, 2014, order of the Circuit Court of Harrison County denying his Amended Petition for a Writ of Habeas Corpus, subsequent to a 2002 guilty plea to two counts of sexual assault and one count of robbery. The Petitioner contends the circuit court erred in denying his requested relief. Upon a thorough review of the record presented to this Court, the arguments of counsel,[1] and applicable precedent, we reverse the circuit court's order and remand this matter for entry of an order granting habeas relief and permitting withdrawal of the Petitioner's guilty plea.

I. Factual and Procedural History

A. Home Invasion and Sexual Assault

On November 30, 2001, at approximately 6:30 a.m., Mrs. L.L.[2] of Clarksburg, West Virginia, awoke in the bedroom of her home and saw an intruder standing beside her bed. The intruder was a white male, and Mrs. L. was an eighty-three-year-old widow who lived alone. Her bedroom was on the second floor of her two-story home. Brandishing a large knife and a flashlight, the intruder said, "This is a robbery, I need your money." Mrs.

---

[1]This Court expresses appreciation for the brief of *Amici Curiae,* former state and federal prosecutors, in support of the Petitioner.

[2]Consistent with this Court's practice in cases involving sensitive matters, only the initials of the victim will be used in this opinion. *See* W.Va. R. App. P. 40; *State v. Shrewsbury*, 213 W.Va. 327, 331 n.1, 582 S.E.2d 774, 778 n.1 (2003).

1

L. responded by informing the intruder that her money was on the first floor. The intruder then forced her to get out of bed and accompany him down the stairs, through the hallway, and into the kitchen. Mrs. L. gave him all the cash from her purse, totaling nine dollars. He then took Mrs. L. back upstairs to search for more money. He informed her that he had "been here before."

The intruder sexually assaulted Mrs. L. when they returned to the bedroom, penetrating her vaginally from behind three times and forcing her to perform oral sex on him twice. He subsequently tied her hands behind her back, told her not to call anyone for twenty minutes, and departed. Twenty minutes later, Mrs. L. freed herself and telephoned her son, a Clarksburg police officer. Three police officers responded to the call and transported Mrs. L. to the hospital.

Mrs. L. was interviewed by a sexual assault nurse at the hospital. In this interview, Mrs. L. described the crime in detail, explaining that the assailant had not worn a condom and may have ejaculated. In response to the nurse's question "[w]ere there multiple assailants," Mrs. L. answered, "no." Although she was described to be in "mild distress," Mrs. L. was considered alert and lucid during that interview.

Later that day, at approximately 1:40 p.m., Mrs. L. provided a detailed, tape-recorded statement to the police. In that statement, she reiterated details of the robbery and assault, explaining she had awakened to find a man standing beside her bed demanding money. The statement she provided to the police was almost identical to that provided to the nurse. Mrs. L. again related the circumstances of the robbery and assault, stating that the intruder took her back upstairs after they searched for money and demanded that she undress and "get down there beside the bed on [her] knees." Mrs. L described her assailant as a white male "in the 25 [-year-old] area." She indicated that he was wearing blue jeans with a light colored t-shirt and that his face was partially hidden by a white bandana.

## B. The Investigation

On December 7, 2001, approximately one week after the assault, the nineteen-year-old Petitioner was arrested for three non-violent, breaking and entering offenses at businesses in downtown Clarksburg.[3] The Petitioner was questioned for approximately nine hours. Although he admitted his involvement in the burglary offenses, he repeatedly stated

---

[3]The businesses included the Salvation Army, the Stealey Pool, and a tobacco shop. The Salvation Army is located three-tenths of a mile from Mrs. L.'s home. The Salvation Army crime occurred approximately eight hours prior to the assault on Mrs. L. A juvenile co-defendant in the Salvation Army breaking and entering case, A.L., was arrested with the Petitioner. The juvenile originally told investigators that the Petitioner bragged about breaking into a home, but he later recanted that story. A second co-defendant in that case, twenty-nine-year-old Ronald Perry, was also arrested. Items stolen from the Salvation Army were found in Mr. Perry's residence.

that he did not commit the robbery and assault of Mrs. L. At 3:25 a.m., however, he told the officer that he had broken into "[t]his old lady's house" but said he could not recall any sexual assault. The Petitioner provided very limited details about the incident; the information he provided was substantially inconsistent with Mrs. L.'s account of the robbery and assault.[4] When the officers informed the Petitioner they knew he could recall more and they would give him one last opportunity "to sing," he retracted his account of the incident and stated: "You really want to know the truth?. . . I didn't do it." He continued his statement by explaining, "I had (inaudible) breathing down my neck," and "I made up a story" about what occurred. He said, "I couldn't tell you what went on in there. . . ."

On December 18, 2001, attorney Thomas G. Dyer was appointed to represent the Petitioner. According to testimony later adduced at hearings on the Petitioner's request for habeas relief, he admitted to Mr. Dyer that he had participated in three non-violent break-ins of local businesses but did not admit involvement in the sexual assault and robbery.

---

[4]For example, the victim indicated she had awakened to find the assailant in her bedroom; the Petitioner said he encountered the victim in the dining room. The victim indicated that the assailant sexually assaulted her upstairs; the Petitioner said he did not go upstairs. The victim indicated that money was stolen; the Petitioner said no money was stolen. The police investigation indicated that the point of entry was the back door of the home; the Petitioner said he entered through a side window. The victim indicated that the assailant made disparaging comments about a photograph in her home; the Petitioner said no comments were exchanged.

4

He further informed Mr. Dyer that he had an alibi; he had allegedly returned to a motel to spend the night after the Salvation Army break-in.[5]

### C. Indictment

The Petitioner was indicted for the robbery and sexual assault of Mrs. L., as well as the crimes of breaking and entering and accompanying property damage to the Clarksburg businesses. The robbery and sexual assault indictment included five separate counts of first-degree sexual assault, with a potential minimum sentence of fifteen years and a maximum of thirty-five years on each count, and one count of first-degree robbery, with a possible ten-year minimum and an indeterminate maximum sentence. On January 29, 2002, Mr. Dyer filed a Motion to Compel Production of Discoverable Materials, noting the State had been ordered to produce "all discoverable information . . . related to the alleged sexual assault" within seven days of arraignment and had not yet done so.

### D. The DNA Testing by the State Police Lab

Lieutenant Brent Myers of the West Virginia State Police Forensic Laboratory received Mrs. L.'s rape kit and began his DNA evaluation on January 22, 2002. He had been asked to expedite testing, and by February 8, 2002, he had tentatively concluded that the

---

[5]The Petitioner alleges that Mr. Dyer did not attempt to corroborate this alibi, interview witnesses, or obtain information from the hotel desk clerk.

5

DNA did not belong to the Petitioner. On February 9, 2002, Lieutenant Myers began the process of retesting the samples. During those procedures, he noted the possibility of more than one male DNA source. However, even that secondary source did *not* appear to be the Petitioner.

On April 5, 2002, *six weeks before* the circuit court accepted a guilty plea from the Petitioner, Lieutenant Myers completed his report by concluding: "[A]ssuming there are only two contributors (including [Mrs. L.]), Joseph Buffey is excluded as the donor of the seminal fluid identified [from the rape kit] cuttings." The report was mailed to Detective Robert Matheny of the Clarksburg Police Department on July 12, 2002.

It is uncontested that Lieutenant Myers' report was *not* provided to the defense before the circuit court accepted the Petitioner's guilty plea. Mr. Dyer testified he was "desperate" to learn the test results. Despite his repeated inquiries prior to the Petitioner's acceptance of the plea offer, Mr. Dyer was informed the results were not yet complete. He later indicated, during habeas proceedings, that he would have "put the brakes on the Judge['s] accepting the plea" if he had known the results excluded the Petitioner as the sperm source. In particular, Mr. Dyer was asked:

> If you had known that by February 11th the West Virginia State Police Forensic Laboratory had reached some preliminary conclusions to the effect that if there were - if there was only two people involved that would be the victim and the

6

perpetrator, Joe Buffey was excluded . . . would you have let Joe
Buffey plead?

Mr. Dyer answered: "Of course not."

E. The Guilty Plea

On January 30, 2002, the State presented the Petitioner with a time-limited plea offer. The Petitioner signed the plea agreement on February 6, 2002, agreeing to plead guilty to two counts of sexual assault and one count of robbery. In exchange, the State agreed to dismiss the charges regarding the business burglaries. The charges to which the Petitioner pled guilty carried a potential sentence of forty years to life imprisonment. Mr. Dyer recalled the urgency to take the plea and stated, "we were put on a short fuse" because the plea offer was only available for a limited time.[6] Mr. Dyer explained he had "strongly recommended" signing the plea agreement and had told the Petitioner he was likely to get concurrent sentences on all the counts to which he was pleading guilty. He also informed the Petitioner that his acceptance of the plea offer would likely result in a sentence no longer than a potential sentence for the business-related burglaries.[7]

---

[6]The Petitioner later testified, during habeas proceedings, that he did not delay signing the plea agreement because it was described to be a time-limited offer and he thought signing the agreement was his only choice. Despite repeated references to the time-limited plea offer, the date upon which the offer was allegedly set to expire is not clear from the record.

[7]The State had also indicated that it might prosecute the Petitioner for statutory rape, based upon the pregnancy of his thirteen-year-old girlfriend.

On February 11, 2002, the Petitioner allocuted to the three charges, saying he "broke into an elderly lady's house and robbed her and forced her to have sex with me." The circuit court delayed acceptance of the plea in order to obtain "some additional information . . . to make sure [the] plea is the right thing to do." The court instructed the Division of Corrections to conduct a pre-sentence evaluation of the Petitioner. That evaluation, completed April 29, 2002, reported that the Petitioner admitted to committing the store burglaries but denied sexually assaulting Mrs. L.

The plea hearing resumed on May 21, 2002, and the court accepted the Petitioner's plea. The court sentenced the Petitioner to forty years on the robbery charge and fifteen to thirty-five years on each sexual assault charge, to run consecutively, for an aggregate term of seventy to one hundred ten years. The Petitioner's profession of innocence to the Division of Corrections was not discussed, nor was the completion of the DNA testing revealed.

F. First Denial of Habeas Relief

On November 14, 2002, the Petitioner filed a pro se request for habeas corpus relief, claiming ineffective assistance of counsel and prosecutorial misconduct. At that time, the Petitioner was *still* unaware that the DNA testing had been completed. Counsel Terri Tichenor was appointed to represent the Petitioner in the habeas proceeding in early 2003.

Insisting he was innocent, the Petitioner asked her to obtain the results of the DNA testing. Ms. Tichenor contacted Traci Cook, assistant prosecuting attorney, to inquire about the DNA testing. When Ms. Cook subsequently telephoned Ms. Tichenor with information, Ms. Cook said, "We have a problem." She informed Ms. Tichenor of her discovery that the State's DNA tests had been completed, with a report issued in April 2002. On March 31, 2003, Ms. Tichenor filed an Amended Habeas Petition, which included the additional issue of suppressed DNA results.[8] Ms. Tichenor also hired a pathologist as an expert for purposes of DNA evaluation.[9]

An omnibus hearing was held on March 12, 2004. The court heard testimony regarding the DNA evidence from the Petitioner's expert, as well as Lieutenant Myers of the police lab and Frances Chiafari of a genetic testing laboratory in Baltimore, Maryland. Based upon the DNA evidence available at that time, the experts could not conclude with "one

---

[8]Eleven grounds were raised by the Petitioner in the first habeas proceeding. He asserted: involuntary plea, failure of counsel to appeal conviction, coerced confession, suppression of evidence, ineffective assistance of counsel, refusal of continuance, insufficiency of evidence, question of actual guilt, more severe sentence than expected, excessive sentence, and mistaken advice of counsel as to parole or probation eligibility.

[9]Ms. Tichenor hired Dr. Vimal Mittal, a pathologist. Dr. Mittal was not a DNA analyst and had never worked in a DNA laboratory or conducted a DNA test. He had no training in DNA science and no qualification or experience as a DNA expert.

hundred percent" certainty that the Petitioner could be ruled out as a potential, minor contributor.[10]

Additionally, in response to the Petitioner's assertion that the State had suppressed evidence of the favorable DNA test results prior to acceptance of the Petitioner's plea, the State argued the plea should stand because officials were personally unaware of the April 2002, report at the time of the Petitioner's guilty plea.[11]

On April 2, 2004, the circuit court denied the Petitioner's request for habeas relief, finding the DNA results to be inconclusive. A petition for appeal to this Court was refused.

---

[10]At the hearing, Lieutenant Myers explained he could not state definitively how many contributors were present in the mixture or whether the Petitioner might theoretically be among them. He stated that this conclusion was based upon the absence of a known profile of the individual who had deposited the primary male DNA he examined. Lacking a sample from the man whose sperm was clearly present, to reveal which DNA alleles belonged to that unknown man, he could not "one hundred percent" exclude the Petitioner from also being present somewhere in the mixture as a minor donor.

[11]The State also presented the testimony of Ronald Perry, an individual arrested with the Petitioner in the Salvation Army break-in. Mr. Perry testified that the Petitioner had told him that he and a "cousin" had taken turns holding down the victim and sexually assaulting her. It was later revealed that Mr. Perry twice sought reconsideration of his sentence based upon his assistance to the State in the Petitioner's case. Moreover, the Petitioner emphasizes that Mr. Perry's statement was inconsistent with the victim's statement, and the police did not attempt to investigate the allegation of a "cousin" being involved in the crime.

G.  The DNA Retesting and Second Habeas Petition

On July 1, 2010, the Petitioner, represented by current counsel, filed a Motion for Post-Conviction DNA Testing under West Virginia Code § 15-2B-14 (2014). The motion was granted, and by employing newly-developed testing methods, the examiners obtained *a more detailed* DNA profile from the crime scene.[12]  The Petitioner was again conclusively excluded as the primary sperm source.  Moreover, the examiners also identified trace amounts of a second male sperm source, as Lieutenant Myers had discovered in 2002.  The testing revealed that the second source was definitively *not* the Petitioner.[13]

Based upon the results of the new DNA testing that excluded the Petitioner as either a primary or secondary sperm contributor, the Petitioner sought a writ of habeas corpus.  In December 2012, while the habeas petition was pending, the circuit court authorized a search of the CODIS database[14] to determine whether the primary sperm source

---

[12]The second round of DNA testing also identified DNA evidence on multiple items from Mrs. L.'s sexual assault kit and bedding, including items previously found to be negative for semen.

[13]The very low level of DNA from the second source indicated the source was not an ejaculator and the sperm had probably been transferred to the penis of the single assailant prior to the assault.  An independent DNA analyst who performed the new testing, Alan Keel, explained that while this phenomenon may seem unlikely, it is a recognized reality in the forensic DNA field and the relevant literature.  He further indicated that the extremely low levels of DNA are inconsistent with what data would be expected to show if there had been a second male perpetrator.

[14]CODIS is an acronym for Combined DNA Index System, an FBI database system containing DNA profiles contributed by federal, state, and local participating forensic

could be identified. The search revealed that the primary sperm source was Adam Bowers, a West Virginia prison inmate.[15] Mr. Bowers was sixteen years old at the time of Mrs. L.'s sexual assault, lived a few blocks from Mrs. L., had a history of sexual violence, and had been Mrs. L.'s paper boy.[16]

Despite the new DNA testing results, excluding the Petitioner as any source of semen, the second application for habeas relief was denied subsequent to a July 2013 omnibus hearing. The circuit court reasoned:

> [T]his Court rejects the Petitioner's claims that the recent DNA testing analysis and CODIS search results purportedly identifying an individual other than the Petitioner herein as the primary (and arguably sole) contributor of the male DNA found at the crime scene is evidence sufficient to; (a) raise a sufficiently substantive question as to the actual guilt; (b) prove in and of itself the Petitioner's "actual innocence"; (c) show there presently being a "manifest injustice" imposed upon him by his present criminal convictions and related sentencing/incarceration; and/or (d) demonstrate a "manifest necessity" resulting all therefrom warranting this Court to grant

laboratories.

[15]The evidence is conflicting on the degree to which the Petitioner and Mr. Bowers may have been acquaintances. Mr. Bowers went to high school with the Petitioner's younger sister. Both the Petitioner's girlfriend and a friend testified that the Petitioner and Mr. Bowers had been together at the Petitioner's mother's home approximately one month prior to the sexual assault of Mrs. L. Although the girlfriend testified that the Petitioner and Mr. Bowers had engaged in car robberies together, she had previously told defense counsel that the Petitioner did not know Mr. Bowers.

[16]Mr. Bowers was indicted for the sexual assault and robbery of Mrs. L. in January 2014, and was convicted of those crimes subsequent to a May 2015 jury verdict.

his requested Habeas relief and allow him to withdraw his prior guilty pleas and order them vacated.

Notably, Lieutenant Myers agreed that the Petitioner could be conclusively excluded as both the primary and secondary contributor. However, the circuit court found that the DNA exclusions did "not . . . unequivocally determine whether or not [the Petitioner] was actually present [at the crime scene] and a participant in the various activities giving rise to the . . . criminal charges."

The Petitioner also presented new evidence that the prosecution was aware of the exculpatory nature of the DNA results as early as February 2002 during the course of Lieutenant Myers' initial testing. The circuit court declined to grant relief on the basis of the Petitioner's argument that new evidence proved the State's suppression of DNA evidence prior to the entry of his guilty plea. The Petitioner now appeals the circuit court's rejection of his request for habeas relief.

## II. Standard of Review

This Court reviews a circuit court's dismissal of a habeas petition under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard;

13

the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006). Further, "[o]n an appeal to this Court the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court." Syl. Pt. 2, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973).

### III. Discussion

The Petitioner asserts multiple assignments of error, contending the circuit court erred by denying habeas corpus relief where: (1) the most recent DNA evidence revealing the perpetrator to be a different individual, Adam Bowers, is consequently evidence of the Petitioner's actual innocence; (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose an exculpatory DNA report it possessed more than six weeks prior to the final plea hearing; (3) the Petitioner's counsel was ineffective; (4) the Petitioner's indictment was secured through false grand jury testimony; and (5) the Petitioner's claims are not barred by res judicata. Upon review by this Court, we find that the Petitioner is entitled to relief based upon the State's failure to disclose exculpatory DNA evidence.[17]

---

[17]Premising our reversal upon the failure to disclose exculpatory evidence, we do not address the Petitioner's assertions of ineffective assistance of counsel, presentation of false grand jury testimony, or his claim of actual innocence based upon most recent DNA testing. Further, while this Court recognizes numerous conflicts in the evidence, including, inter alia, (continued...)

14

A. *Brady v. Maryland*

In *Brady*, the United States Supreme Court observed that "our system of the administration of justice suffers when any accused is treated unfairly." *Id*. at 87. Seeking to alleviate unfair treatment, the Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*

In addressing the guidelines enunciated in *Brady,* this Court explained as follows in syllabus point two of *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007):

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

*Id*. at 22, 650 S.E.2d at 121; *see also State ex rel. Games-Neely v. Overington*, 230 W.Va. 739, 749, 742 S.E.2d 427, 437 (2013). Evidence is deemed material "if there is a

---

[17](...continued) witness testimony, recantations, and inconsistent recollections concerning the various perpetrators of the Clarksburg business crimes and the whereabouts of the Petitioner during the crime against Mrs. L., those factual inconsistencies are of no moment to this Court's conclusion that the Petitioner is entitled to relief based upon the prosecution's failure to disclose exculpatory DNA evidence.

reasonab[le] probability that, had the evidence been disclosed to the defense the result of the proceeding would have been different." *State v. Morris*, 227 W.Va. 76, 85, 705 S.E.2d 583, 592 (2010) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). However, "a showing of materiality does not require demonstration by a preponderance [of the evidence] that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . ." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

### B. Applicability of *Brady* to Plea Negotiation Stage of Proceedings

The case sub judice raises the issue, not previously addressed by this Court, of whether the prosecution has a duty to disclose exculpatory evidence at the plea bargaining stage. The United States Supreme Court's *Brady* decision was specifically directed toward trial behavior. 373 U.S. at 87. The United States Supreme Court has not determined whether the principles underlying *Brady* apply to the disclosure of exculpatory evidence during the plea bargaining stage.[18]

The critical nature of plea negotiations was recently addressed by the United States Supreme Court in the context of effective client assistance during the pre-plea stage.

---

[18]As artfully asserted in the amicus brief, if *Brady* is exclusively a *trial* right, "it has become a hollow reed." A substantial majority of criminal cases are resolved by guilty pleas; thus, plea bargaining is "not some adjunct to the criminal justice system; it *is* the criminal justice system." *Missouri v. Frye*, 132 S.Ct 1399, 1407 (2012) (emphasis added).

*See Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012). The Court held that defendants possess a Sixth Amendment right to counsel that extends to the plea bargaining process. *Id.* This conclusion is premised, in part, upon the fact that "criminal justice today is for the most part a system of pleas, not a system of trials. Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas[.]" *Id*. at 1388. "In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Frye*, 132 S.Ct. at 1407. In *Lafler*, the Supreme Court concluded that "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler*, 132 S.Ct. 1376, 1388 (2012).

The Supreme Court's observations concerning the importance of plea negotiations in *Lafler* "suggest that the assertion that *Brady* is a 'trial right' will not preclude it from being applied during plea bargaining." M. Petegorsky, *The Duty to Disclose Exculpatory Brady Evidence During Plea Bargaining*, 81 Ford. L. Rev. 3599, 3647 (2013).

> The chief concern of the Supreme Court in both *Lafler* and [*Frye*] was ensuring a fair judicial process that results in just outcomes, not solely ensuring fair trials. This concern necessitates pre-plea disclosure of exculpatory *Brady* evidence, because just as a defendant "cannot be presumed to make critical decisions without counsel's advice," neither can he be presumed to make an informed decision to plead guilty without material exculpatory evidence.

*Id*. at 3647-48 (quoting *Lafler*, 132 S.Ct. at 1385).

We observe that the conclusions of jurisdictions evaluating *Brady's* application to plea negotiations have been widely inconsistent. The rationales employed by those courts are analyzed below.

1. *Brady* Challenge to Guilty Plea:
Rationale for Requiring Disclosure
of Material Exculpatory Evidence

Directly addressing the applicability of *Brady* principles to plea negotiations, the Ninth Circuit Court of Appeals in *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995), explained that "'a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case.'" *Id*. at 1453 (quoting *Miller v. Angliker*, 848 F.2d 1312, 1320 (2nd Cir. 1988)). Further, the court stated that a waiver of the right to trial "cannot be deemed 'intelligent and voluntary' if 'entered without knowledge of material information withheld by the prosecution.'" 50 F.3d at 1453. The court reasoned that a contrary decision could create a temptation for prosecutors "to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas." *Id*.; *see also United States v. Persico*, 164 F.3d 796, 804-05 (2d Cir. 1999) ("The Government's obligation to disclose *Brady* materials is pertinent to the accused's decision to plead guilty; the defendant is entitled to make that decision with full awareness of favorable [exculpatory and

18

impeachment] evidence known to the Government."); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government."); *accord White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988); *Campbell v. Marshall,* 769 F.2d 314, 321 (6th Cir. 1985); *State v. Sturgeon*, 605 N.W.2d 589, 596 (Wis. Ct. App. 1999).

Addressing the issue of the applicability of *Brady* to the disclosure of impeachment evidence during plea negotiations in *United States v. Ruiz*, 536 U.S. 622 (2002), the United States Supreme Court held that a defendant did *not* have a due process right to pre-plea disclosure of *impeachment* information[19] in the possession of the prosecution. *Id*. at 623. The specific issue before the Court in *Ruiz* was whether federal prosecutors are required to disclose "impeachment information relating to any informants or

___

[19]In *Ruiz*, the United States Supreme Court recognized a minimal risk that "in the absence of impeachment information, innocent individuals . . . will plead guilty," and a significant risk that requiring disclosure of impeachment material could "seriously interfere with the [prosecution's] interest in securing . . . guilty pleas . . . disrupt ongoing investigations, and expose prospective witnesses to serious harm." 536 U.S. at 631-32. The amicus brief in the present case indicates agreement with the decision in *Ruiz*: "As former prosecutors, most of us believe that *Ruiz* was rightly decided. Requiring prosecutors to disclose impeachment material pre-plea could jeopardize on-going investigations and threaten the safety and privacy of witnesses."

other witnesses" before entering into a binding, "fast track" plea agreement with a criminal

defendant prior to indictment. *Id*. at 625.[20]

In ruling that such disclosure was not constitutionally mandated, however, the

Court in *Ruiz* specifically distinguished *impeachment* evidence from *exculpatory* evidence.[21]

*Id.* at 630. The Court noted that impeachment evidence differs from exculpatory evidence

because it is not "critical information of which the defendant must always be aware prior to

pleading guilty given the random way in which such information may, or may not, help a

particular defendant." *Id*.

This *Ruiz* distinction between impeachment evidence and exculpatory evidence

has been analyzed repeatedly by courts attempting to negotiate issues regarding fairness of

plea negotiations. The Nevada Supreme Court clearly articulated the foundations of the *Ruiz*

distinction in *State v. Huebler*, 275 P.3d 91 (Nev. 2012), *cert. denied*, 133 S.Ct. 988 (2013):

> In our opinion, the considerations that led to the decision
> in *Ruiz* do not lead to the same conclusion when it comes to
> material exculpatory information. While the value of
> impeachment information may depend on innumerable variables
> that primarily come into play at trial and therefore arguably

---

[20]As an additional rationale, the Supreme Court in *Ruiz* observed that the plea agreement already specified that the government would provide material exculpatory evidence. *Id*. at 630.

[21]"Exculpatory evidence" is defined as "[e]vidence tending to establish a criminal defendant's innocence." Black's Law Dictionary 637 (9th ed. 2009).

make it less than critical information in entering a guilty plea, the same cannot be said of exculpatory information, which is special not just in relation to the fairness of a trial but also in relation to whether a guilty plea is valid and accurate. For this reason, the due-process calculus also weighs in favor of the added safeguard of requiring the State to disclose material exculpatory information before the defendant enters a guilty plea . . . [A] right to exculpatory information before entering a guilty plea diminishes the possibility that innocent persons accused of crimes will plead guilty. . . . In turn, the adverse impact on the government of an obligation to provide exculpatory information is not as significant as the impact of an obligation to provide impeachment information. And importantly, the added safeguard comports with the prosecution's "special role . . . in the search for truth."

*Id*. at 97-98 (internal quotations omitted). In *Huebler*, the court ultimately held that the State is required under *Brady* to disclose material exculpatory evidence within its possession to the defense before the entry of a guilty plea. If the State fails to disclose such information, a defendant may challenge the validity of the guilty plea.[22]

Federal circuit courts of appeals have also addressed the issue of providing exculpatory evidence during plea negotiations, in light of the *Ruiz* decision.[23] In *McCann v.*

---

[22]The *Huebler* court ultimately found, however, that videotapes withheld by the State in that case were not material; thus, the State's failure to disclose such videotapes did not warrant withdrawal of the guilty plea. 275 P.3d at 100.

[23]*See generally* Michael Nasser Petegorsky, Note, *Plea Bargaining in the Dark: The Duty to Disclose Exculpatory Brady Evidence During Plea Bargaining*, 81 Fordham L. Rev. 3599, 3614-29 (2013) (examining impact of *Ruiz* and duty to disclose exculpatory evidence during plea bargaining process).

*Mangialardi*, 337 F.3d 782 (7th Cir. 2003),[24] for instance, the *Ruiz* distinction between exculpatory and impeachment evidence was discussed, and the Seventh Circuit observed:

> In contrast [to *Ruiz's* impeachment evidence], the exculpatory evidence at issue in this case . . . is entirely different. Thus, we have a question not directly addressed by *Ruiz*: whether a criminal defendant's guilty plea can ever be "voluntary" when the government possesses evidence that would exonerate the defendant of any criminal wrongdoing but fails to disclose such evidence during plea negotiations or before the entry of the plea.

*Id.* at 787. The Seventh Circuit reasoned in *McMann* that "it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors . . . have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea." *Id.* at 788.[25]

The Tenth Circuit Court of Appeals examined this issue in *United States v. Ohiri*, 133 F. App'x 555 (10th Cir. 2005), upon the appeal of a defendant who had pled guilty to three counts of storing hazardous waste without a permit. The defendant in *Ohiri* asserted that he would not have pled guilty to "knowingly" storing hazardous waste if he had been

---

[24]In *McCann*, the defendant alleged that his rights to procedural due process were violated by law enforcement's failure to "disclose to prosecutors, defense counsel, and the court, prior to the entry of his guilty plea, that the drugs found in the car he was driving on the day of his arrest were planted without his knowledge." 337 F.3d at 787.

[25]The Seventh Circuit did not resolve the issue "because even if such disclosures of factual innocence are constitutionally required, McCann has not presented any evidence that Mangialardi [deputy chief of the police department] knew about the drugs being planted in McCann's car prior to the entry of his guilty plea." *Id.* at 788.

aware of another individual's Acceptance of Responsibility Statement. *Id.* at 561.

Concluding that the district court had abused its discretion in refusing to allow an amendment

of the defendant's federal habeas petition to allege a *Brady* or due process violation, the

Tenth Circuit observed that *Ruiz* "did not imply that the government may avoid the

consequences of a *Brady* violation if the defendant accept[ed] an eleventh-hour plea

agreement while ignorant of withheld exculpatory evidence in the government's possession."

*Id.* at 562.  The court reasoned:

> *Ruiz* is distinguishable in at least two significant respects.  First,
> the evidence withheld by the prosecution in this case is alleged
> to be exculpatory, and not just impeachment, evidence.  Second,
> Ohiri's plea agreement was executed the day jury selection was
> to begin, and not before indictment in conjunction with a
> "fast-track" plea.  Thus, the government should have disclosed
> all known exculpatory information at least by that point in the
> proceedings.

*Id.*[26]

Similarly, in *United States v. Nelson*, 979 F.Supp.2d 123 (D.D.C. 2013), the

defendant had pled guilty to traveling from Virginia to Washington, D.C., to engage in illicit

sexual conduct and subsequently argued that his guilty plea was not knowing or voluntary

because it was entered without knowledge of exculpatory evidence withheld by the

---

[26]Subsequent to remand of this matter, the court ultimately concluded that the undisclosed evidence was not material. *United States v. Ohiri*, 287 F. App'x 32, 35 (10th Cir. 2008).

23

government.  *Id*. at 126.[27]  The United States District Court for the District of Columbia

noted:

> While neither the D.C. Circuit nor the Supreme Court has spoken on whether a defendant can withdraw his guilty plea postsentencing if he entered it without the government having disclosed exculpatory evidence it possessed, the majority of circuits to have considered the issue have held that a *Brady* violation can justify allowing a defendant to withdraw a guilty plea. *See, e.g., United States v. Ohiri*, 133 Fed.Appx. 555, 562 (10th Cir. 2005); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988); *Campbell v. Marshall*, 769 F.2d 314, 322–24 (6th Cir. 1985)[.]

979 F.Supp.2d at 129.  The court ultimately held that the defendant would be permitted to

withdraw his guilty plea, finding that "because the prosecution suppressed exculpatory

evidence before Nelson pled guilty, Nelson's due process rights were violated to his

prejudice and his guilty plea was not voluntary and knowing." *Id.* at 135.

> Permitting a defendant to move to withdraw a guilty plea he entered without having been given exculpatory evidence in the government's possession comports with the purpose of the prosecution's *Brady* obligation.  Accordingly, in light of the balance of circuit court precedent and the purpose of *Brady*, Nelson can assert his *Brady* claim to argue that his guilty plea was not knowing and voluntary.

---

[27]The evidence withheld in *Nelson* constituted a recorded electronic communication between an undercover police officer and the defendant that the defendant contended could have been used to bolster an entrapment defense.  979 F.Supp.2d at 134.

*Id.* at 130; *see also Warren v. City of Birmingham*, 2012 WL 8719055, *3 (N.D. Ala. 2012) (holding that "[a]lthough there is an open question as to whether *Brady* applies pre-plea to exculpatory evidence, the court assumes without deciding that the Due Process Clause obligates a police officer to disclose material exculpatory evidence before the criminal defendant enters his guilty plea."); *United States v. Danzi*, 726 F.Supp.2d 120, 128 (D. Conn. 2010) (holding exculpatory evidence must be disclosed in plea negotiations, reasoning that "[t]he Court declines the Government's invitation to hold that *Ruiz* applies to exculpatory as well as impeachment material"); *Ollins v. O'Brien*, 2005 WL 730987, *11 (N.D. Ill. 2005) ("[T]he Court finds the *Ruiz* distinction . . . persuasive and holds that due process requires the disclosure of information of factual innocence during the plea bargaining process."); *Medel v. State,* 184 P.3d 1226, 1235 (Utah 2008) ("We therefore conclude that, in order for a guilty plea to be rendered involuntary based on the prosecutor's failure to disclose evidence, a petitioner must establish that the evidence withheld by the prosecution was material exculpatory evidence.").

2. *Brady* Challenge to Guilty Plea:
Rationale for Not Requiring
Disclosure of Material Exculpatory Evidence

In contrast to the cases analyzed above, the Fifth Circuit has taken the opposite approach, suggesting that a defendant is not entitled to exculpatory evidence at the plea stage because the purpose of *Brady* is to guarantee a fair *trial*. In *Matthew v. Johnson*, 201 F.3d

25

353 (5th Cir. 2000), the Fifth Circuit stated that "[t]he *Brady* rule's focus on protecting the integrity of trials suggests that where no trial is to occur, there may be no constitutional violation." *Id.* at 361. The court found that "[b]ecause a *Brady* violation is defined in terms of the potential effects of undisclosed information on a judge's or jury's assessment of guilt, it follows that the failure of a prosecutor to disclose exculpatory information to an individual waiving his right to trial is not a constitutional violation." *Id.* at 361-62. The Fifth Circuit reaffirmed its approach to the issue nine years later in *United States v. Conroy*, 567 F.3d 174 (5th Cir. 2009), rejecting the argument that "the limitation of the [United States Supreme] Court's discussion [in *Ruiz*] to impeachment evidence implies that exculpatory evidence is different and must be turned over before entry of a plea." *Id*. at 179.[28]

Likewise, in *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010), the Fourth Circuit explained that

> [t]he *Brady* right, however, is a trial right. It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment, and exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty.

---

[28]*See also Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010) (declining to address hypothetical issue of suppression of exculpatory evidence, but speculating that "even if" suppressed impeachment evidence had been exculpatory, *Ruiz* likely applied to prevent challenge for concealment of such evidence).

*Id*. at 285. However, because the court found that the defendant in *Moussaoui* did not demonstrate a *Brady* violation, it declined to resolve the issue of whether relief for a *Brady* violation at the guilty plea stage would be available. *Id*. at 286-88.

Just three years later, however, the Fourth Circuit's approach was markedly different. In *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), the appellate court held that a law enforcement officer's false statement in a search warrant affidavit constituted impermissible government conduct. *Id.* at 462.[29] Further, the court held that the defendant had established that his guilty plea was induced by the officer's misconduct and reasoned that "[i]f a defendant cannot challenge the validity of a plea based on subsequently discovered police misconduct, officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas." *Id*. at 469. The court in *Fisher* also quoted the recognition in *Sanchez* that "if a defendant may not raise a *Brady* [*v. Maryland* ] claim after a guilty plea, prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas"). *Id*. (quoting *Sanchez*, 50 F.3d at 1453).

---

[29]The court in *Fisher* noted that the "Defendant's misapprehension [in pleading guilty] stems from an affirmative government misrepresentation that strikes at the integrity of the prosecution as a whole." *Id*. at 466 (internal quotations omitted). "Because the lawyer [for the defendant] thought that there were no grounds on which to challenge the warrant, she believed the government's case to be 'a strong one' and advised Defendant to enter a plea." *Id*.

3. Application of *Brady* Principles to Plea Negotiations in West Virginia

Having scrutinized the reasoning of other jurisdictions, this Court finds that the better-reasoned authority supports the conclusion that a defendant is constitutionally entitled to exculpatory evidence during the plea negotiation stage. *See* Kevin C. McMunigal, *Guilty Pleas, Brady Disclosure, and Wrongful Convictions*, 57 Case W. Res. L. Rev. 651 (2007) (discussing reasons innocent people plead guilty and how *Brad*y disclosure in guilty plea context reduces risk of such pleas). "Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." *United States v. Oakes*, 411 F.Supp.2d 1, 4 (D. Me. 2006) (internal citations omitted). Permitting a prosecutor to withhold exculpatory evidence during a defendant's evaluation of a plea offer would essentially "cast[] the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Brady*, 373 U.S. at 88.

Both the United States Supreme Court and inferior courts throughout the country have consistently recognized that our criminal justice system has imbued prosecutors with a "special role . . . in the search for truth." *Strickler v. Green*, 527 U.S. 263, 281 (1999). The Court has encouraged resolution of doubtful issues in favor of disclosure. In *United States v. Agurs*, 427 U.S. 97 (1976), the Court reasoned: "Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can

28

seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.* at 108.

In *Cone v. Bell*, 556 U.S. 449 (2009), the United States Supreme Court explained:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady,* only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. *See Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 ("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3–3.11(a) (3d ed. 1993)"). *See also* ABA Model Rule of Professional Conduct 3.8(d) (2008) ("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal") As we have often observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure.

556 U.S. at 470 n.15; *see also Kyles*, 514 U.S. at 437 (recognizing that prosecution has affirmative duty to disclose evidence because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence. . . .").

Courts have also been diligent in emphasizing that "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). *Brady* requires a prosecutor to "disclose information of which it has knowledge and access." *United States v. Padilla*, 2011 WL 1103876, *7 (D. N.M. 2011) (internal citations omitted). Such duty to disclose extends to all evidence in the possession of the prosecution team, including police and scientists, regardless of whether the prosecutor is personally aware of the evidence. *Kyles*, 514 U.S. at 433.[30] Further, whether the failure to disclose is intentional is irrelevant because the duty exists "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

In *Berger v. United States*, 295 U.S. 78 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960), the United States Supreme Court discussed the duty of a prosecutor:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which

---

[30]*See Kyles*, 514 U.S. at 438-39 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

30

is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. at 88.

The principles justifying a holding that a criminal defendant must be permitted to challenge a guilty plea based upon the prosecution's failure to disclose exculpatory material were expressed sagaciously in *Nelson.* In that case, the United States District Court for the District of Columbia referenced *Brady's* recognition of an inscription on the walls of the United States Department of Justice, stating: "The United States wins its point whenever justice is done its citizens in the courts." *Nelson,* 979 F.Supp.2d at 130 (quoting *Brady*, 373 U.S. at 87). Expounding upon this proposition, the court in *Nelson* continued:

A defendant who is forced to make a choice about going to trial or pleading guilty unaware that the government has not disclosed evidence 'which, if made available, would tend to exculpate him,' *id*. [*Brady*] at 87-88, 83 S.Ct. 1194, suffers unfair treatment unworthy of the bedrock ideal inscribed on the Justice Department walls. Moreover, precluding a defendant from raising such a *Brady* claim after a guilty plea could create a risk too costly to the integrity of the system of justice to countenance - tempting a prosecutor to stray from that bedrock ideal and 'deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas.' *Sanchez*, 50 F.3d at 1453. If a prosecutor did so, that would "cast[ ] the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice[.]" *Brady*, 373 U.S. at 88, 83 S.Ct. 1194. Permitting a defendant to move to withdraw a guilty plea he

> entered without having been given exculpatory evidence in the
> government's possession comports with the purpose of the
> prosecution's *Brady* obligation. Accordingly, in light of the
> balance of circuit court precedent and the purpose of *Brady*,
> Nelson can assert his *Brady* claim to argue that his guilty plea
> was not knowing and voluntary.

*Nelson*, 979 F.Supp.2d at 130.

In full recognition of the desired objective to promote justice for this state's citizens, this Court holds that these fundamental principles compel the conclusion that a defendant's constitutional due process rights, as enumerated in *Brady v. Maryland*, 373 U.S. 83 (1963), extend to the plea negotiation stage of the criminal proceedings, and a defendant may seek to withdraw a guilty plea based upon the prosecution's suppression of material, exculpatory evidence.

## C. Resolution of the Petitioner's Appeal

This Court is presented with the Petitioner's contention that the State violated the due process obligations enunciated in *Brady* by failing to disclose material, favorable results of DNA testing prior to the Petitioner's guilty plea.[31] As discussed above, the United

---

[31]The State argues that this Court's examination of the Petitioner's assertions regarding failure to disclose exculpatory evidence is foreclosed by the doctrine of res judicata because that issue was raised in the first request for habeas relief. The "extent to which principles of res judicata apply in post-conviction habeas corpus proceedings" was addressed in *Losh v. McKenzie*, 166 W. Va. 762, 763, 277 S.E.2d 606, 608 (1981). In syllabus point four of *Losh*, we held:

(continued...)

States Supreme Court in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The three components of a *Brady* claim, as recognized by this Court in *Youngblood*, include the existence of evidence that is favorable to the accused as exculpatory or impeachment evidence, suppressed by the State either willfully or inadvertently, and material. 221 W.Va. at 29, 650 S.E.2d at 128. Furthermore, the *Brady*

---

[31](...continued)

> A prior omnibus habeas corpus hearing is res judicata as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however, an applicant may still petition the court on the following grounds: ineffective assistance of counsel at the omnibus habeas corpus hearing; newly discovered evidence; or, a change in the law, favorable to the applicant, which may be applied retroactively.

*Id*. at 762, 277 S.E.2d at 608; *see also Markley v. Coleman*, 215 W. Va. 729, 732-33, 601 S.E.2d 49, 52-53 (2004).

Based upon this Court's review of the record in this case, we find that the Petitioner was not precluded, in his second habeas request, from raising the issue of the State's failure to disclose exculpatory evidence because his claims are premised upon new evidence. Subsequent to the first habeas proceeding, the Petitioner obtained the significantly more detailed and technologically advanced testing of DNA through the statutory mechanism enunciated in West Virginia Code § 15-2B-14. This evidence provided additional support for the Petitioner's claim that the original DNA testing was exculpatory, material, and improperly suppressed by the State. Further, the Petitioner presented new evidence indicating that the prosecuting attorney's office had actual knowledge of the laboratory's DNA results well before the Petitioner's plea was finalized. As explained above, personal knowledge by the prosecutor is not required to support a finding of suppression of evidence; this new evidence, however, further supports the Petitioner's claim of police misrepresentation and concealment of the status of the DNA testing.

decision ineluctably obligates prosecutors to ensure that all exculpatory material in the possession of its investigators is disclosed; thus, suppression by either a prosecutor or an investigator can constitute a violation of *Brady*.  Syllabus point one of *Youngblood* makes this abundantly clear:

> A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor.  Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor.

221 W.Va. at 22, 650 S.E.2d at 121.

### 1. Favorable Evidence

With regard to the first prong of the *Brady* analysis, the Petitioner contends the DNA results, finalized by Lieutenant Myers on April 5, 2002, were *favorable* to the Petitioner.  Favorable evidence has been described as evidence that tends to exculpate. *Bagley*, 473 U.S. at 676.  Exculpatory evidence has been defined to be "that which would tend to show freedom from fault, guilt or blame." *United States v. Blackley*, 986 F.Supp. 600, 603 (D.D.C. 1997).

In response, the State contends the DNA testing results were inconclusive and therefore not actually favorable to the Petitioner.  However, the State's "argument . . .

confuses the weight of the evidence with its favorable tendency." *Kyles,* 514 U.S. at 451.

Indeed, the State could have adopted a trial strategy focusing upon the inconclusiveness of

the DNA results and/or the possibility that the Petitioner was present even if someone else

committed the sexual assault. Such potential trial strategy, however, does not negate the

critical nature of the fact that the Petitioner could have utilized the DNA evidence to support

a theory of innocence. Because we find the DNA evidence was favorable, the first element

of a *Brady* violation is established.

## 2. Suppression of Evidence

Addressing the second prong of a *Brady* violation, the State contends it did not

actually *suppress* the DNA testing results. Rather, the State claims that July 12, 2002, the

date upon which the evidence was mailed to Detective Matheny, was the first and only time

Lieutenant Myers orally communicated his conclusions. Evidence presented by the

Petitioner, however, indicates the initial testing demonstrated the exculpatory nature of the

results and was available as early as February 2002. Moreover, subsequent to the July 2013

omnibus hearing, counsel for the State revealed a file notation referencing Lieutenant Myers'

conversation with the Prosecuting Attorney's Office concerning the exculpatory nature of the

initial DNA results that occurred as early as March 2002.[32]

---

[32]The notation indicated that Lieutenant Myers notified former assistant prosecuting attorney Terri O'Brien that he was "leaning toward excluding" the Petitioner based upon the initial DNA testing results. The Petitioner emphasizes that because Ms. O'Brien resigned
(continued...)

Further, any knowledge of associated agencies, such as the police laboratory, is imputed to the State, as referenced above. Mr. Dyer repeatedly inquired of the State regarding the status of the test results. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("[W]hen the prosecution represents that all such material has been disclosed[,]" it is reasonable for defense counsel to rely on prosecution's representation.). Although the State asserts it did not know of the finalized test results prior to the mailing of July 2002, this claim is unavailing in light of the State's duty to disclose information in the possession of its affiliates, in this case the police laboratory. Thus, the State's obligation to produce the DNA results was not extinguished by its assertion that it was unaware of the status of testing. Accordingly, this Court finds that the second prong of the *Brady* violation was established by the Petitioner.

3. Materiality of Evidence

The third prong of a *Brady* inquiry involves the *materiality* of the evidence and *prejudice* to the Petitioner. In *Youngblood*, this Court stated:

> This Court has recognized, along with the United States Supreme Court, that " '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *State v. Fortner*, 182

---

[32](...continued)
on March 28, 2002, that conversation must have occurred before the May 21, 2002, plea hearing.

W.Va. 345, 353, 387 S.E.2d 812, 820 (1989) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).

221 W.Va. at 32, 650 S.E.2d at 131; *see also United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010). A reasonable probability is more than a mere possibility, but less than a preponderance of the evidence. *Kyles*, 514 U.S. at 434.

The State relies heavily upon its assertion that the Petitioner would have pled guilty regardless of any favorable DNA test results.[33] Critically, his own testimony and the testimony of his counsel belie this assertion. Mr. Dyer specifically indicated that he would have advised the Petitioner not to plead guilty if he had obtained the favorable test results. The Petitioner explained that he was operating upon the understanding that pleading guilty was his only viable choice, based upon the time-limited plea offer and his counsel's approval of that deal.

Premising its assertions upon the possibility of condom usage, the State also argues that the DNA evidence, no matter how exculpatory, did not exclude the possibility

---

[33]The Petitioner informed his counsel that he was confident the DNA evidence would exonerate him. The State attempts to posture this statement in a manner which inculpates the Petitioner by speculating that the Petitioner made this assertion based upon his knowledge that he wore a condom and would therefore not have provided any DNA evidence. Other than evidence indicating that the Petitioner had a condom with him on the day of the Salvation Army break-in, there is no evidence of condom usage in the record.

that the Petitioner was an accomplice to the crime. While this may arguably be true, it does not detract from the exculpatory nature of the evidence of DNA testing or its materiality. If the prosecution possessed evidence linking the Petitioner to the crime, it was certainly capable of presenting that evidence at trial. The evidence of exculpatory DNA test results, however, still required disclosure.

The circuit court, in denying relief to the Petitioner on the suppression of evidence claim, noted that it was not "sufficiently convince[d]" that the evidence "fully exculpates the Petitioner as to the crimes to which he voluntarily entered guilty pleas." That is not the standard by which this matter is to be judged. "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434.

Under the circumstances of the present case, this Court finds that the suppressed evidence was material and that the Petitioner suffered prejudice as a result of its concealment. There was, as *Youngblood* requires, a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 221 W.Va. at 32, 650 S.E.2d at 131. If this case had proceeded to trial, the DNA evidence could have been used by the Petitioner to cast a reasonable doubt upon the his guilt on the sexual assault charges. *See Sanchez,* 50 F.3d at 1454 (internal citations omitted)

38

("[T]he issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial.") (internal citations omitted).

This Court is presented with a situation in which a defendant repeatedly requested the results of DNA testing; was incorrectly informed that such testing was not yet complete; and was presented with a time-limited plea offer that he accepted upon advice of counsel. We find that the DNA results were favorable, suppressed, and material to the defense. Thus, the Petitioner's due process rights, as enunciated in *Brady*, were violated by the State's suppression of that exculpatory evidence.

## IV. Conclusion

Based upon the foregoing analysis, this Court finds that the State's failure to disclose favorable DNA test results obtained six weeks prior to the Petitioner's plea hearing violated the Petitioner's due process rights, to his prejudice. This Court reverses the June 3, 2014, order of the Circuit Court of Harrison County and remands this matter for an order granting habeas relief and permitting the Petitioner to withdraw his guilty plea.

Reversed and Remanded with Directions